**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Mark ROSS, Defendant–Appellant.**

**No. 97–4252.**

United States Court of Appeals,
Sixth Circuit.

Argued June 15, 1999

Decided July 27, 1999

Harry R. Reinhart (argued and briefed), Columbus, Ohio, for Defendant–Appellant.

Robyn Jones (argued and briefed), Office of the U.S. Attorney, Columbus, Ohio, for Plaintiff–Appellee.

Before: GUY, COLE, and CLAY, Circuit Judges.

RALPH B. GUY, JR., Circuit Judge.

Defendant, Mark Ross, an attorney, appeals his convictions and sentence following a joint trial with three other co-defendants, including a former client, on four counts of a 113–count superceding indictment. Defendant was convicted of conspiracy to distribute and to possess with intent to distribute cocaine, 21 U.S.C. § 846; conspiracy to commit money laundering, 18 U.S.C. § 1956(h); and two counts of money laundering, 18 U.S.C. §§ 1956(a)(1)(B)(i) and 2. Defendant challenges his convictions on the grounds that (1) he was precluded from fully presenting his defense because of the assertion of attorney-client privilege on behalf of his co-defendant Robert Long, and (2) the evidence was insufficient to show he knew of and joined the conspiracies. With respect to his sentence, defendant claims the district court erred by (1) denying him a reduction in his base offense level either for acceptance of responsibility or for being a minimal participant in the conspiracy; (2) granting an enhancement for using a special skill in the commission or concealment of the offense; (3) finding he was responsible for laundering funds in excess of $100,000; and (4) denying him a downward departure because of factors not adequately taken into account by the guidelines. After careful review of the record and the arguments on appeal, we affirm defendant's convictions and his sentence.

I.

The charges arose out of a long-running multi-state conspiracy to distribute cocaine and launder the proceeds. Robert Long, Robert Camero, and Donald Mohler, Jr., devised a scheme to distribute marijuana in Columbus, Ohio, through Mohler's aunt, Karen Climer Collins Long (Karen Long).[1] About 1986, Robert Long and Donald Mohler switched to the distribution of cocaine. Mohler left the conspiracy about 1988 and the Longs, who were living together, began managing the cocaine distribution operation. Although their suppliers changed over the years, the Longs distributed at least one and then two kilograms of cocaine every two months until the government executed several search warrants in late July and August 1995. From about 1991, the Longs paid others to store and distribute the cocaine for them; including Robert Camero, Marilyn Ross, Donald Ross, Sally and Lonnie Huff, Charles Sullivan, Sr., and Bill and Carolyn Climer.

Robert Long first retained Mark Ross in 1988 to represent him in connection with

---

1. Karen Climer Collins Long will be referred to as Karen Long, although she did not marry Robert Long until 1990. Without giving a recitation of the interrelationships between most of the defendants, we note that the conspiracy to distribute cocaine was built largely upon the extended family and friends of Karen Long.

his divorce from his first wife. Ross also represented Karen Long in a divorce from her previous husband. Over time, Mark Ross represented Robert and Karen Long on a number of discrete matters, including collection work for Robert's legitimate business activities, on several real estate transactions, and when Karen's daughter got into trouble. Mark Ross and Robert Long became friends. While there was no evidence that Ross participated in the cocaine distribution activities, he admitted knowing that the Longs were involved with drugs and receiving small quantities of cocaine from the Longs on several occasions.

The activities involved in the money laundering conspiracy ran the gamut from making wire transfers and obtaining cashier's checks in the names of other individuals, to investing in legitimate businesses and purchasing property. Mark Ross, however, was only charged with two substantive counts of money laundering, which related to (1) the sale of property located at 1173 Faber Avenue, to Donald Ross in order to conceal the nature, source, or ownership of drug proceeds; and (2) the posting of a $20,000 cash bond for Charles Sullivan, Jr., one of the co-conspirators, with intent to promote the drug conspiracy.[2]

In early August 1995, after the search warrants were executed, Mark Ross traveled to Florida to meet with the Longs to give them legal advice. It was during these meetings that Mark Ross claimed he first learned of the conspiracy. At that time, Ross advised the Longs to liquidate their assets and participated in meetings with other co-conspirators to discourage them from cooperating with the government. Shortly after that, Mark Ross received approximately $60,000 in cash from the Longs, which he kept in a desk drawer. He did not file currency transaction forms concerning the money and failed to disclose to the grand jury that he had received this money. Mark Ross also placed attorney liens on the remaining property to thwart forfeiture. After the Huffs were subpoenaed by the grand jury, Ross met with the Huffs, the Longs, and another attorney to discuss the Huffs' grand jury testimony. Ross told the Huffs that they would get only a "slap on the hand" for perjury. The Huffs subsequently lied to the grand jury, were indicted for perjury, and cooperated with the government.

Of the 31 defendants indicted in this case, nearly all of them pleaded guilty and cooperated with the government. The four defendants who neither pleaded guilty nor were dismissed, Mark Ross, Robert Long, Rodolfo Fernandez, and Stivi Nechovski, were tried together. The jury acquitted Nechovski, but convicted Fernandez, Long, and Ross on all counts. The district court denied Mark Ross' motion for judgment of acquittal under Fed. R.Crim.P. 29 and sentenced him to a term of 120 months' imprisonment on each count, to run concurrently. This appeal followed.

## II.

### A. Sufficiency of Evidence

Mark Ross challenges the sufficiency of the evidence to support a finding that he joined in either conspiracy, particularly since he claims to have only learned the details in the course of lawfully representing Robert Long. On appeal, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could

---

2. The conspiracy to commit money laundering count alleged that from at least 1992 Karen and Robert Long, conspiring with Mark Ross and others, used the considerable proceeds of the cocaine operation and engaged in financial transactions designed in whole or part to (1) conceal or disguise the nature, location, source, ownership, or control of the proceeds; (2) avoid transaction reporting requirements under state or federal law; or (3) promote the carrying on of the conspiracy to distribute and to possess with intent to distribute cocaine.

have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (emphasis in original). In making this determination, "we refrain from independently judging the credibility of witnesses or weight of the evidence." *United States v. Welch*, 97 F.3d 142, 148 (6th Cir.1996), *cert. denied*, 519 U.S. 1134, 117 S.Ct. 999, 136 L.Ed.2d 879 (1997).

█ The essential elements of the crime of conspiracy are that the alleged conspiracy existed, the defendant willfully became a member, and one of the conspirators knowingly committed at least one alleged overt act in furtherance of some object or purpose of the conspiracy. *See United States v. Lee*, 991 F.2d 343, 348 (6th Cir.1993). In this case, there was extensive and overwhelming evidence presented establishing the existence of both (1) the conspiracy to distribute and to possess with intent to distribute cocaine and (2) the conspiracy to commit money laundering.

> The government need not show that a defendant participated in all aspects of the conspiracy; it need only prove that the defendant was a party to the general conspiratorial agreement. Although the connection between the defendant and the conspiracy need only be slight, an agreement must be shown beyond a reasonable doubt.

*United States v. Avery*, 128 F.3d 966, 971 (6th Cir.1997). It is also not necessary to show that a defendant knew the full extent of the enterprise. *See United States v. Lloyd*, 10 F.3d 1197, 1210 (6th Cir.1993).

█ First, Mark Ross claims he was nothing more than a supplier of lawful services being used in an illicit operation, relying upon *United States v. Falcone*, 109

F.2d 579 (2nd Cir.), *aff'd*, 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128 (1940) (sugar supplier to operator of illegal still not a member of the conspiracy despite knowing the buyer would use supplies illegally). As this court explained in *United States v. Grunsfeld*, 558 F.2d 1231, 1236–37 (6th Cir.1977), *Falcone* and the subsequent decision in *Direct Sales Co. v. United States*, 319 U.S. 703, 63 S.Ct. 1265, 87 L.Ed. 1674 (1943), hold that one does not become a party to a conspiracy merely by supplying goods that he knows the buyer will use illegally, unless he also knows of the conspiracy. We find that the evidence taken in the light most favorable to the government is sufficient to support a finding that Mark Ross knew of the drug conspiracy and joined in it by engaging in laundering of drug proceeds. There is also ample evidence to support the jury's finding that Mark Ross joined in the money laundering conspiracy.[3]

█ Although there was no evidence that Mark Ross participated in the distribution of cocaine, we have held that money laundering is an act integrally related to the success of a conspiracy to distribute drugs. *See United States v. Todd*, 920 F.2d 399, 406 (6th Cir.1990). Money laundering alone, however, is not sufficient to link a person who launders money with a conspiracy to violate drug laws. "The government must demonstrate a 'sufficient link' between defendant's money-laundering and the drug distribution conspiracy in order to prove that defendant was part of the conspiracy." *Id.* (citing *United States v. Dela Espriella*, 781 F.2d 1432, 1436 (9th Cir.1986)).

Although Ross denied that he knew about the conspiracy to distribute cocaine until he met with the Longs in August 1995, Karen Long testified that she and

---

3. Defendant's reliance upon *United States v. Kelly*, 888 F.2d 732 (11th Cir.1989), is misplaced. In *Kelly*, an attorney learned that his client had buried a kilogram of cocaine, which his co-defendant wanted returned. Despite calls and attempts by the government

informant to involve the attorney in efforts to secure return of the drugs, the attorney was recorded repeatedly refusing to get involved. The court found the evidence was insufficient to establish that the attorney had joined the conspiracy.

Robert discussed the drug business with Mark Ross many times and said Mark "knew everything." Karen admitted that she and Robert did not initially tell Mark about their drug business and could not say when Robert told him about it. Karen also conceded that she never told Mark Ross that their primary source of income was drug trafficking, but testified that "he basically knew."

Mark Ross admitted receiving a small amount of cocaine, for personal use, as a gift from the Longs three times between about 1990 and 1995. While Ross denied knowing that the Longs were *trafficking* in drugs, he admitted knowing that Robert was involved with drugs and testified that Robert told him he "got cocaine on occasion." In April 1995, Karen directed Donald Ross to deliver "two" to Mark Ross meaning $2,000 for legal services performed in connection with the transfer of the Faber property. When two ounces of cocaine were delivered instead, Mark called Karen about the mix-up. Karen testified that although she offered to retrieve the cocaine and give him cash, Mark said he could get more than $2,000 for it.

The government relied upon real estate transactions involving residences located on Gibson Drive and on Faber Avenue, as well as the posting of a bond with drug proceeds, to establish Mark Ross' involvement in the cocaine and money laundering conspiracies. Although the Gibson Drive transaction was not charged as a substantive offense, it was alleged to be an overt act in furtherance of the conspiracy to launder money. The Faber Avenue transaction and the posting of the bond were the basis of the substantive money laundering charges for which Mark Ross was convicted.

Karen and Robert Long lived at the Gibson Drive residence from about 1988 until 1994. The house belonged to Karen's sister and brother-in-law, Loretta and Eugene Newsome. The Longs paid them $10,000 and took over the payments on the mortgage. Mark Ross prepared a land contract and quitclaim deed in March 1989, which was not filed until May 1990. The quitclaim deed did not indicate the consideration paid. Then the Longs purchased money orders made out in the names of the Newsomes to be used for the mortgage payments. There was no evidence, however, that Mark Ross knew about the money orders. Also, while there was evidence that financial transactions regarding this house involved the proceeds of drug distribution, there was no evidence showing Mark knew the monies were drug proceeds in 1989. In May 1995, the Longs sold the Gibson property and Mark Ross signed the papers on their behalf under a power of attorney. Evidence that Mark Ross knew of the cocaine and money laundering conspiracies at the time he prepared the quitclaim deed for the Gibson property was thin. Nonetheless, there was ample evidence to support a finding that he knew of and joined in both conspiracies by engaging in money laundering in connection with the Faber property.

Robert Long purchased the house on Faber from Karen's brother-in-law in August 1994, for $12,000 cash. The affidavit prepared by Mark Ross, however, listed no consideration and indicated that the house was vacant and was transferred to the Longs subject to past due loans. In April 1995, the Faber property was sold to Donald Ross for $30,000. Donald Ross testified that he paid $30,000 in cash, while Karen said the $30,000 was deducted from amounts owed to Donald for his work distributing cocaine. The deed prepared by Mark Ross said Donald Ross paid $7,500 in cash, $7,500 in the form of a note, and $11,000 in "sweat equity."

Karen testified that when she, Robert, and Mark discussed the contracts for this transfer in April 1995, Mark knew what business they were in and knew that Donald Ross worked for them distributing drugs. She also testified that Mark Ross knew how much the property was being sold for and was the one to come up with the idea of "sweat equity."

Q: You did not provide any information to Mark Ross as to what the figures were that this house was being sold for; isn't that true? Bob [Robert] did all of that?

A: I was there.

Q: Okay. Did Bob indicate to Mark that there was a certain amount of equity that this man should get credit for, for being there and doing the work?

A: Bob—Mark knew the house was being bought with drug money. He said he would come up with something. Bob said he worked on it, and that's when he made the contracts.

Q: How are you aware of that?

A: I was there when we were talking about it.

By concealing the amount of money involved, the source of the money was hidden.[4] Mark Ross also attended the closing for a residence on Blue Valley Drive to sign on behalf of the Longs, since they were living in Florida. This house was allegedly used to launder drug proceeds.

With respect to the posting of a bond, which occurred prior to the discussions from which Mark Ross claimed to have first learned of the drug conspiracy, there was evidence that Mark Ross was retained by Robert Long to investigate the arrest of Karen's nephew, Charlie Sullivan, Jr. Ross learned from attorney Michael Holbrook that Sullivan, while in custody, was providing information to the authorities about the Longs. Ross advised the Longs that they should post bond for Sullivan because he might cooperate with the government. He also advised the Longs not to use the telephone because they were under investigation. Following that advice, Karen Long told Marilyn and Donald Ross to take $20,000 in drug proceeds to Karen's mother. The cash was used by Holbrook to post the bond.

Mark Ross testified that he was "startled" to learn that a cash bond had been posted, rather than a "property" bond. In contrast, Karen Long testified that Mark Ross knew the bond would be posted in cash. Holbrook also testified that before he posted the bond, he discussed where the money was coming from with Carol Sullivan and Mark Ross. We find there was sufficient evidence from which the jury could find that Mark Ross knew that drug proceeds would be used to post the bond for Sullivan with the hope that he would not cooperate with the government.

The government also contended that Mark Ross participated in the conspiracies in the role of a "concealer" through his money laundering activities, advice to co-conspirators, participation in meetings to discourage others from cooperating, and concealment of his receipt of nearly $60,000 in cash. Defendant emphasizes that an innocent defense attorney would legitimately advise his clients not to talk to investigators, avoid making incriminating statements over the telephone, and consider posting bond for co-conspirators being held in custody. Were this the only evidence of defendant's connection to the conspiracies, we could not say the evidence was sufficient to show he had joined in the conspiracies. That is not the case here. The evidence was sufficient to support Mark Ross' conviction for conspiracy to commit money laundering, and to establish the necessary "link" between his money laundering activities and the drug conspir-

---

4. Defendant argues that the evidence on the count relating to the Faber property was at material variance from the charge in the indictment that the transaction involved drug proceeds and was designed to conceal, in whole or part, the nature, source, or ownership of those proceeds. Defendant claims there is a material variance because Karen Long testified that no money changed hands and the $30,000 was deducted from money owed to Donald Ross for distributing cocaine. Donald Ross remembered paying $30,000 in cash for the property, with money earned both from drug trafficking and legitimate business. Donald Ross testified that the contract was drafted to make it appear that he could afford to buy the house with legitimate income. There is no fatal variance between the proofs and the evidence adduced at trial.

acy in order to support his conviction for conspiracy to distribute and to possess with intent to distribute cocaine.

## B. Right to Present a Defense

■ Mark Ross contends that he was denied the right to fully present his defense by the invocation of the attorney-client privilege on behalf of Robert Long, relying upon *Crane v. Kentucky*, 476 U.S. 683, 690, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986) (circumstances of defendant's confession could not be excluded because relevant to its credibility). Specifically, Ross argues that he was prevented from testifying concerning when he acquired information about the nature and extent of the conspiracy. Ross was reminded of the privilege a number of times and asserted the privilege before admitting he had received cocaine from the Longs.[5]

It is true that an objection was sustained, preventing defendant from repeating what he claims he was told by the Longs on August 9, 1995. Defendant was nonetheless permitted to testify that he did not know about the conspiracies until the meetings in early August 1995, as part of his legal representation of Karen and Robert Long. Suggesting that he therefore did not learn of the conspiracies until they had "collapsed," Ross maintained he could not have joined the conspiracies. Further, since Karen Long was not able to identify when Ross was first told about the cocaine distribution operation, Ross argues that there is a reasonable possibility that the invocation of the attorney-client privilege contributed to his convictions. We find defendant was not denied his right to present his defense; rather, the jury did not believe him.

## C. Sentencing

■■ We review the district court's factual findings for clear error. *See United States v. DeFranco*, 30 F.3d 664, 669 (6th Cir.1994). Issues involving the interpretation of the guidelines are legal questions, which we review de novo. *See United States v. Jones*, 159 F.3d 969, 980 (6th Cir.1998). The district court concluded, over the government's objection, that the amount of cocaine reasonably foreseeable to defendant could not be determined by a preponderance of the evidence. As a result, the base offense level for the money laundering counts was used to calculate the guideline sentencing range.

To the base offense level of 23, the court added (1) three points because defendant knew the funds were proceeds of cocaine distribution; (2) one point because the value of the funds exceeded $100,000; (3) two points for the use of a "special skill" in the commission or concealment of the offense; and (4) two points for obstruction of justice. The district court also rejected defendant's request for a two-point reduction for acceptance of responsibility and a four-level reduction for being a minimal participant in the conspiracy. These adjustments yielded a base offense level of 31 and, with a criminal history score of zero, the guideline range was 108 to 135 months. The district court denied defendant's motion for a downward departure pursuant to U.S. Sentencing Guidelines Manual § 5K2.0 (1995), and sentenced defendant to 120 months' imprisonment.

■ Arguing that he testified truthfully concerning the factual basis for the charges, Mark Ross claims it was clear error to find he was not entitled to a two-point reduction for acceptance of responsibility. While a defendant is not disqualified from receiving the reduction by testi-

5. Both Mark Ross and Robert Long claimed that error resulted from the fact that Ross had represented Long on these charges before he was indicted as well. We rejected Robert Long's claim that refusal to grant severance denied him a fair trial because of alleged disclosures of privileged information by Mark Ross. Severance is not an issue in this case because the attorney-client privilege would be applicable even if Mark Ross had been tried separately.

fying on his own behalf, Mark Ross never acknowledged any wrongdoing. In fact, defendant's statement at sentencing was:

> I am absolutely not guilty of this. I made some mistakes, but I am not guilty. I don't think that I better say anything else.
>
> There are people who are guilty of hard-core narcotics trafficking who are walking out of here with as little as 22 months.

We find no error.

 Next, Mark Ross claims the district court committed clear error in denying him a four-level reduction for being a "minimal participant" in the conspiracy under U.S.S.G. § 3B1.2. Defendant bears the burden of proving by a preponderance of the evidence that he was "substantially less culpable than the average participant" in the criminal enterprise. *See United States v. Miller,* 56 F.3d 719, 720 (6th Cir.1995). "Under this provision, the defendant's lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others is indicative of a role as a minimal participant." U.S.S.G. § 3B1.2, comment. (n.1). The district court rejected defendant's contention, finding "it is clear that the defendant played a major role in concealing Robert and Karen Long's drug activities from law enforcement authorities." While Mark Ross had a small role in the scope of the drug distribution activities and claimed not to have knowledge or an understanding of the nature and extent of the conspiracy until he met with the Longs in August 1995, the question is whether he was a minimal participant in the money laundering activities upon which the sentencing calculations were based. Defendant did not show he was substantially less culpable than the average participant in the money laundering activities.

 Next, Mark Ross objected to the two-point enhancement under U.S.S.G. § 3B1.3, which applies when a defendant uses a special skill "in a manner that sig-nificantly facilitate[s] the commission or concealment of the offense." The application notes provide that:

> "Special skill" refers to a skill not possessed by members of the general public and usually requiring substantial education, training or licensing. Examples would include pilots, lawyers, doctors, accountants, chemists, and demolition experts.

U.S.S.G. § 3B1.3, comment. (n.2) (emphasis added). Defendant argues that, although an attorney, he did not use his skill as an attorney to significantly facilitate the commission or concealment of the offense. He notes that real estate papers are regularly prepared by people who are not attorneys, and contends that the advice he gave to the conspirators was nothing more than common sense. The district court found that the evidence proved "defendant used his education and training to provide legal assistance surrounding the transfer of real estate, to influence Lonnie and Sally Huff to commit perjury before the grand jury, and to help get Charles Sullivan, Jr., released from jail" and noted that others were relying upon him for assistance because he was an attorney. The district court's finding was not clearly erroneous.

 Defendant contests the finding that the "value of the funds" laundered exceeded $100,000, which resulted in the one-point enhancement to the base offense level pursuant to U.S.S.G. § 2S1.1(b)(2). Notably, the presentence investigation report recommended that no increase was warranted because the counts of conviction involved the $20,000 bond and $26,000 transaction for the sale of the Faber property. With respect to the other real estate transactions, the report indicated it was unknown whether Mark Ross would have been aware that the funds used were proceeds of drug trafficking.

The government objected and argued that the approximately $60,000 in cash received and concealed by Mark Ross should be included. The district court sustained

the objection, noting that the defendant may be held accountable for all reasonably foreseeable acts in furtherance of the jointly undertaken criminal activity, and found:

> Evidence presented at trial showed the defendant was involved in the handling of several pieces of real estate for the Longs, totaling well over $100,000, and in other money laundering activities, not the least of which is $59,000 and so forth. So, we easily get to in excess of $100,000.

Mark Ross received nearly $60,000 in cash from the Longs after he admittedly learned the extent of the conspiracies. He held the cash and concealed its receipt from the grand jury. Although there was no direct evidence that Mark Ross knew each of the real estate transactions involved the proceeds of drug activities, the district court did not err in finding it was reasonably foreseeable to Mark Ross that funds in excess of $100,000 were being laundered.

Finally, Ross appeals the district court's refusal to grant a downward departure under U.S.S.G. § 5K2.0, arguing that the guidelines do not contemplate a conviction on the cocaine conspiracy charge when no amount of cocaine could be attributed to him as relevant conduct. As noted previously, the base offense level was calculated based upon defendant's money laundering convictions, not his drug conspiracy conviction. At sentencing, defendant also urged the court to depart downward because the loss of his profession and the need to support his two children mitigated the need for punishment. The district court's discretionary refusal to depart downward is generally not appealable, absent a showing that the district court mistakenly believed it did not have authority to do so. *See United States v. Clements*, 144 F.3d 981, 984 (6th Cir.1998); *United States v. Ebolum*, 72 F.3d 35, 37 (6th Cir.1995). There is no indication that the district court refused to depart downward on the belief that it did not have the authority to do so.

**AFFIRMED.**