*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0273P (6th Cir.)
File Name: 03a0273p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

———————————

MARK ROSS,
*Petitioner-Appellant,*

v.

UNITED STATES OF AMERICA,
*Respondent-Appellee.*

No. 01-4129

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 00-01358—George C. Smith, District Judge.

Argued: June 11, 2003

Decided and Filed: August 6, 2003

Before: KEITH, BATCHELDER, and CLAY, Circuit
Judges.

———————————

### COUNSEL

**ARGUED:** Kevin M. Schad, SCHAD & COOK, Indian
Springs, Ohio, for Appellant. Robyn Jones Hahnert,
UNITED STATES ATTORNEY, Columbus, Ohio, for
Appellee. **ON BRIEF:** Kevin M. Schad, SCHAD & COOK,
Indian Springs, Ohio, for Appellant. Robyn Jones Hahnert,

UNITED STATES ATTORNEY, Columbus, Ohio, for
Appellee.

———————————

### OPINION

———————————

CLAY, Circuit Judge. Petitioner Mark Ross appeals an
order denying his request for habeas relief pursuant to 28
U.S.C. § 2255, following Petitioner's conviction for
conspiracy to distribute cocaine and possession with intent to
distribute cocaine in violation of 21 U.S.C. § 846, conspiracy
to commit money laundering in violation of 18 U.S.C.
§ 1956(h), and two counts of money laundering in violation
of 18 U.S.C. § 1956(a)(1)(B)(i). For the reasons set forth
below, we **AFFIRM** the district court.

### FACTS

Sometime in either late 1994 or early 1995, Donald Mohler,
Jr., Robert Long, and Roberto Camero began smuggling
marijuana into the United States from the Bahamas. Robert
Long and Mohler brought loads of fifty to 200 pounds of
marijuana to Columbus, Ohio, which they distributed through
Mohler's aunt, Karen Climer Collins.

After the arrest of several of their couriers, Mohler and
Robert Long stopped dealing marijuana and began selling
cocaine. Mohler and Robert Long began bringing to
Columbus cocaine supplied by Rodolpho Fernandez. Robert
Long and Mohler concluded their partnership in early 1988.
At that point, Karen Collins (hereinafter referred to as Karen
Long) married Robert Long, and the Longs continued to deal
cocaine supplied by Fernandez.

Initially, Fernandez fronted the Longs one-half kilogram of
cocaine every two months. After about two years, Fernandez
began fronting the Longs an entire kilogram every two

months. This continued until 1992, when Mohler contacted Robert Long again. Mohler could give Robert Long a better price on the cocaine than Robert Long received from Fernandez, so the Longs began dealing with Mohler instead. On October 1, 1993, undercover police arrested Patrick Paden, one of Mohler's couriers, with one kilogram of cocaine.

Attempting to steal from his supplier, Juan Sierra, Mohler told Sierra that he lost two kilograms in the arrest. Sierra discovered Mohler's deception and terminated their relationship. Sierra then asked Robert Long to assume Mohler's role. The Longs paid Sierra $27,000, and Sierra delivered one kilogram for the money and fronted a second kilogram.

In November of 1993, the Longs purchased a new home on 540 Blue Valley Road, outside of Lancaster, Ohio, for $87,000. The Longs initially occupied the Blue Valley residence in April of 1994, but then moved to Florida in December of 1994. The Longs sold the Blue Valley property in April of 1995 for $175,000. Petitioner, an attorney, handled the closing on the Longs' behalf.

After the Longs moved to Florida, they directed their Ohio cocaine business through Donald and Marilyn Ross,[1] who lived in central Ohio. Donald Ross made approximately two trips each month to Tennessee—one to pick up cocaine from Sierra, and another to deliver payment. Donald and Marilyn Ross handled loads of up to eight kilograms per month.

In exchange for their assistance, the Rosses received a portion of the profits and a home at 1173 Faber Avenue. Petitioner handled all paperwork related to the purchase and sale of the Faber property in a manner intended to disguise the transaction's real purpose. Karen Long testified that

---

[1]No relation to Petitioner.

"[Petitioner] knew the house was being bought with drug money. He said he would come up with something. Bob [Robert Long] said [Petitioner] worked on it and that's when he made the contracts." (J.A. at 625-26.)

Before preparing the Faber paperwork, Petitioner received quantities of cocaine for personal use as gifts from the Longs. Donald Ross and Robert Long delivered the drugs. Robert Long later claimed that he sometimes paid Petitioner for his legal services with cocaine.

According to Karen Long, Petitioner knew everything about the Longs' drug business. She and her husband spoke with Petitioner about their enterprise every time they met. Karen Long passed information from Petitioner to the Rosses that helped the Rosses evade law enforcement. At one point, for instance, Karen Long told the Rosses to stop using telephones because Petitioner had a tip that the Rosses were under investigation.

On July 16, 1995, Karen Long told the Rosses to take $20,000 in cocaine proceeds to Karen Long's mother, so that her mother could post bond for Karen Long's nephew, Charles Sullivan, Jr. Petitioner told Karen Long to post the bond because he feared Sullivan might start talking to police about the Longs' drug trade. Karen Long later testified that she and her husband usually followed Petitioner's advice.

On July 29, 1995, law enforcement executed a number of search warrants at homes belonging to Karen Long, members of her family, and Donald and Marilyn Ross. Petitioner contacted the Longs in Florida, informed them of the raids, and traveled to Florida to meet with them. At Petitioner's direction, the Longs sold many of their assets and returned to Ohio.

The Longs gave Petitioner $60,000 from the sale of their assets. After Petitioner received the money, he placed liens

on the Longs' remaining pieces of real estate to prevent the government from attaching them.

A grand jury subpoenaed records of all monies paid to, given to, or handled by Petitioner for the Longs. On March 28, 1996, Petitioner prepared and produced two letters summarizing monies the Longs paid to him for his activities. In those letters, Petitioner indicated that the Longs paid him $5815 between May 29, 1990 and July 12, 1995, and $5800 from August 4, 1994 until February 2, 1996. These estimates dramatically understated the amount of money Petitioner actually received because Petitioner did not include the $60,000.

The Rosses obtained counsel, Michael Holbrook, a friend of Petitioner's. Holbrook discussed with them the possibility of cooperating before indictment. While Holbrook represented the Rosses, Petitioner organized a rendezvous at a local bar with both the Rosses and the Longs without Holbrook present. By chance, Holbrook entered the bar, saw the meeting, and argued with Petitioner about speaking with his clients without his knowledge. Shortly thereafter, Holbrook ceased representing the Rosses.

Petitioner also met with Kathy MacDonald, who worked with the Rosses in their distribution network. Petitioner told MacDonald not to say anything to anyone. MacDonald asked Petitioner if he was scared, because she knew he received cocaine in exchange for legal services performed for the Longs. Petitioner told her he was not worried because the authorities could only convict him for money laundering.

Two other individuals who worked for the Rosses, Sally and Lonnie Huff, met with Petitioner. Petitioner told the Huffs that perjury would result in nothing more than a fine or a very light sentence. Additionally, Petitioner informed the Huffs that the government could revoke any immunity it offered once the Huffs incriminated themselves by testifying. The Huffs also met with Karen Long and Petitioner in

Petitioner's office. During these meetings, Petitioner and Karen Long developed stories the Huffs could relay in the event the government offered them immunity or otherwise compelled them to testify. Following their instructions, the Huffs later told the grand jury they knew nothing of the Longs' drug business.

## PROCEDURAL HISTORY

On May 22, 1996, the grand jury indicted the Longs and nineteen co-conspirators on numerous counts of drug trafficking and money laundering-related offenses. Until September of 1996, Petitioner continued to represent Robert Long. Karen Long retained Michael McGinley. On September 5, 1996, the grand jury returned a Superseding Indictment that added ten additional defendants, including Petitioner. In light of his indictment, Petitioner moved to withdraw as Robert Long's counsel. The district court granted the motion on September 27, 1996. On March 6, 1997, prior to trial, Robert Long and Rodolfo Fernandez, two of the Ross' co-defendants, requested a separate trial. They argued that the evidence introduced against the co-defendants would unfairly prejudice them. The court rejected their respective motions.

On March 5, 1997, the day before trial was scheduled to begin, Petitioner filed a motion for severance requesting that he be tried separately from Robert Long. Petitioner argued that he planned to call Robert Long as a witness in his defense.

At the trial, Petitioner testified that he represented the Longs. He admitted receiving gifts of cocaine from Robert Long, delivered either by Donald Ross or Robert Long himself. Petitioner acknowledged handling the Longs' financial transactions and conceded that "it wouldn't take a rocket scientist to know that they are somehow involved in [the drug trade]." (J.A. at 965.) Yet throughout his testimony, Petitioner denied both that he knew the extent of

the Longs' cocaine enterprise and that he willfully participated in any of the Longs' criminal activity. Counsel for Robert Long represented at a pretrial conference that he did not know whether his client would invoke his Fifth Amendment privilege if called as a witness in a joint trial.[2] The district court denied the request for severance.

Beginning on March 6, 1997, the government jointly tried Petitioner along with several co-conspirators including Robert Long and Rodolfo Fernandez. Requests for severance were renewed throughout the trial and denied. The trial lasted nine weeks and involved more than seventy witnesses. On April 29, 1997, the jury convicted Petitioner, Robert Long, and Fernandez on all counts. Petitioner received a ten-year sentence. In his appeal to this Court,

> [Petitioner] challenge[d] his convictions on the grounds that (1) he was precluded from fully presenting his defense because of the assertion of attorney-client privilege on behalf of his co-defendant Robert Long, and (2) the evidence was insufficient to show he knew of and joined the conspiracies. With respect to his sentence, [Petitioner] claim[ed] the district court erred by (1) denying him a reduction in his base offense level either for acceptance of responsibility or for being a minimal participant in the conspiracy; (2) granting an enhancement for using a special skill in the commission or concealment of the offense; (3) finding he was responsible for laundering funds in excess of $100,000; and (4) denying him a downward departure because of factors not adequately taken into account by the guidelines.

---

[2] During the defense case, Petitioner announced at sidebar that he intended to call Robert Long as a witness. At that time, Robert Long asserted his Fifth Amendment privilege and refused to testify.

*United States v. Ross*, 190 F.3d 446, 448 (6th Cir. 1999). On July 27, 1999, we affirmed Petitioner's conviction. *Id*. With regard to his right to present a defense claim, we determined that Petitioner "was not denied his right to present a defense; rather, the jury did not believe him." *Id*. at 453. Petitioner petitioned for *certiorari*, which the Supreme Court denied on November 29, 1999. *See United States v. Ross*, 528 U.S. 1033 (1999).

Petitioner filed his habeas petition on November 28, 2000. Petitioner attached several exhibits, including an affidavit from Holbrook. Holbrook, who testified for the government at Petitioner's trial, claimed that the U.S. Attorney's Office contacted him prior to trial and asked him to speak with Petitioner about a plea bargain. According to Holbrook, the Assistant U.S. Attorney, Robyn Jones Hahnert, "stated that there was no need for [Petitioner] to go to jail, and [sic] the possibility of avoiding him permanently losing his license." (J.A. at 465.) Holbrook then relayed this information to Petitioner and his counsel, Lew Williams.

According to Holbrook, the meeting revealed that Williams did not understand the case or the sentencing guidelines and could not properly advise his client. Holbrook further indicated that he told Petitioner that "he was in real trouble. . . . [because] Lew had no idea about anything on [sic] the case and that he needed to be educated real fast because it was too late to get another lawyer." (J.A. at 466.) Holbrook also claimed that Hahnert told him that Williams never contacted her about a possible plea. Finally, Holbrook expressed concern over the unprofessional manner in which Williams cross-examined him at Petitioner's trial. Holbrook's affidavit noted that "[i]n a casual meeting in the coffee shop later that day, I was privy to a comment made to me by an attorney for one of the co-defendants about Lew's performance. He questioned his preparation . . . . I was already disgusted with Lew and did not say anything." (*Id*.)

Petitioner also attached his own affidavit to his habeas petition.[3] Petitioner claims that he asked Williams investigate the plea offer but that Williams did not do so until the day of trial, at which point the government no longer expressed interest. Petitioner claimed that he would have pleaded guilty had he received a plea offer that did not involve incarceration.

The government responded with an affidavit from Hahnert. Hahnert acknowledged that during a pretrial meeting with Holbrook, Holbrook expressed concern that his friend, Petitioner, did not fully grasp the severity of his situation. Hahnert advised Holbrook that she offered Petitioner a plea bargain that would require he plead to a money laundering charge. If Petitioner cooperated, the government would include a provision for a downward departure pursuant to U.S.S.G. § 5K1.1. Hahnert also averred that the plea offer never included a recommendation of probation, nor did she ever indicate that Petitioner might not lose his license to practice law. Rather, Hahnert stated that the district court had discretion to place Petitioner on probation if the government made a § 5K1.1 motion, and Petitioner had a better chance to regain his license in the future if he pleaded guilty to a money laundering charge instead of a cocaine distribution charge. Finally, Hahnert denied asking Holbrook to take the plea offer to Petitioner on behalf of the U.S. Attorney's Office.

Petitioner attached a second affidavit from Holbrook to the reply brief he filed with the district court. Holbrook claimed:

> Robyn [Hahnert] did not say that she would recommend neither [sic] probation nor keeping his license to practice law. She did discuss that a plea to laundering, a Base Level 17 offense, would receive a 5K motion. With acceptance [of responsibility] and potential for a minor

---

[3]Petitioner did not sign or notarize the copy he served on the United States.

role this would have placed [Petitioner] in the area of potential probation or half way house. Both attorneys present were aware of the guideline ramifications of the plea offer meant [sic]. There was not a recommendation [sic] offer but the comment that [Petitioner] did not necessarily need to go to jail.

(J.A. at 427.) Holbrook also clarified that "Robyn did not say that she would recommend anything about the license" and that he (Holbrook) "was not acting as an agent for the Government" when he relayed information to Petitioner. (*Id.*)

On July 3, 2001, the magistrate judge issued a Report and Recommendation recommending that the district court deny the § 2255 petition. Petitioner filed objections to that Report on July 13, 2001. On September 24, 2001, without an evidentiary hearing, the district court adopted the Report and Recommendation.

On October 3, 2001, Petitioner filed a timely notice of appeal. The district court granted Petitioner a certificate of appealability on November 29, 2001.

## DISCUSSION

Initially, Petitioner argues that he received ineffective assistance of counsel because his attorney failed to inform him of a plea offer that he would have accepted. The district court rejected this contention on the briefs, and Petitioner asserts he should have at least received an evidentiary hearing. Petitioner also raises a litany of other less substantial ineffective assistance arguments.[4]

---

[4]In his brief, Petitioner argues he received an unconstitutional sentence in violation of *Apprendi v. New Jersey*, 530 U.S. 466 (2000). Petitioner's counsel conceded *Apprendi*'s inapplicability at oral argument, thus we need not address Petitioner's *Apprendi* claim in this opinion.

## I.

We begin with Petitioner's claim that he should have at least received an evidentiary hearing before the district court rejected his argument that his counsel's alleged failure to relay a plea offer constituted ineffective assistance. This Court reviews a district court's decision to deny a § 2255 ineffective assistance of counsel claim without an evidentiary hearing for abuse of discretion. *Blanton v. United States*, 94 F.3d 227, 235 n.2 (6th Cir. 1996); *see also Etheridge v. United States*, 241 F.3d 619, 622 (8th Cir. 2001); *Prewitt v. United States*, 83 F.3d 812, 820 (7th Cir.1996).

The district court should always consider the importance of a hearing in light of what the proper resolution of a particular case requires. *United States v. Todara*, 982 F.2d 1025, 1030 (6th Cir. 1993). If the record includes a factual dispute, the district court "must hold a hearing to determine the truth of the [petitioner's] claims." *Turner v. United States*, 183 F.3d 474, 477 (6th Cir. 1999). Petitioner is not entitled to a hearing, however, "if the files and records of the case conclusively show that he is not entitled to relief." *Green v. United States*, 65 F.3d 546, 548 (6th Cir. 1995).

Petitioner's primary ineffective assistance of counsel claim is that his attorney failed to act on a plea offer made by the U.S. Attorney's Office prior to trial. In support of his argument, Petitioner cites the Holbrook affidavit, in which Holbrook swears, according to Petitioner, "that the AUSA had contacted him prior to trial, and indicated that she would offer the Appellant a plea whereby he could possibly retain his license." (Pet'r Br. at 8.) Holbrook then relayed his communications to Petitioner and his counsel. Since the U.S. Attorney's office denies having made an offer that would not involve jail time and possibly allow Petitioner to retain his license, Petitioner argues a factual dispute exists that warrants an evidentiary hearing.

The government attached Hahnert's affidavit to its reply opposing the § 2255 petition. Hahnert averred that she never made a plea offer to Holbrook that would guarantee or even recommend probation. Hahnert acknowledged possibly allowing Petitioner to plead to money laundering charges and receive a § 5K1.1 motion for substantial assistance. This would permit Petitioner to argue to the sentencing court that he should receive probation. Again, Hanhert never offered to recommend probation or to help Petitioner retain his license.

In Petitioner's reply brief, Petitioner submitted a second affidavit from Holbrook that clarified his earlier testimony. Holbrook concurs that "Robyn [Hahnert] did not say that she would recommend []either probation nor keeping his license to practice law." (J.A. at 427.) Rather, Holbrook concedes that he assumed a plea to money laundering and a § 5K1.1 motion would reduce Petitioner's base offense level to the point where he could, theoretically, avoid prison. Thus, Holbrook does not claim Hahnert ever offered probation or to help Petitioner keep his license.

Since Holbrook's supplementary affidavit is entirely consistent with Hahnert's affidavit, there is no factual dispute, rendering a hearing unnecessary.[5] *See Green*, 65 F.3d at 548. Thus, the district court did not abuse its discretion by declining to hold an evidentiary hearing concerning Petitioner's ineffective assistance of counsel claims.

---

[5] Petitioner also purports to deserve an evidentiary hearing on his other ineffective assistance claims, discussed below. This argument is without merit because Petitioner fails to identify any evidence that he could have presented in an evidentiary hearing that the district court did not consider before denying his petition. Petitioner bases all of his other ineffective assistance claims on the record to which the district court had access.

## II.

Like others in his position, this Petitioner adopts the "kitchen sink" approach to habeas by alleging that virtually every aspect of his trial counsel's representation was improper and prejudicial.

Petitioner's other ineffective assistance of counsel claims present mixed questions of law and fact that we review *de novo*. *United States v. Jackson*, 181 F.3d 740, 744 (6th Cir. 1999); *Lucas v. O'Dea*, 179 F.3d 412, 416 (6th Cir. 1999). In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court articulated a two-part test for determining whether an attorney rendered ineffective assistance. *Id*. at 689. As the Court explained,

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Id*. at 687.

With respect to the deficient performance component of the two-part test, the *Strickland* Court noted that judicial review of a lawyer's performance should be "highly deferential." *Id*. at 689. According to *Strickland*, "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Id*. at 688. As the Supreme Court explained, "[b]ecause of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the presumption that, under the circumstances, the challenged

action might be considered sound trial strategy." *Id*. at 689; *see also Martin v. Rose*, 744 F.2d 1245, 1249 (6th Cir. 1984).

To establish prejudice, Petitioner must show a reasonable probability that, but for his attorney's errors, the proceedings would have produced a different result. *Strickland*, 466 U.S. at 694. When applying *Strickland*, if we can more easily dispose of an ineffective assistance claim based on lack of prejudice, we should follow that route. *Watson v. Marshall*, 784 F.2d 722, 726 (6th Cir. 1985).

Generalizing somewhat, we can say that Petitioner makes three basic arguments: (1) counsel failed to negotiate a plea; (2) counsel did not timely move for a motion to sever; and (3) counsel failed to investigate Petitioner's case and prepare for trial. Before analyzing in detail whether Petitioner has established prejudice with respect to any of these three issues, we note that Petitioner, who admits to drug use, failed to appear for trial twice because he "overslept." On the stand, Petitioner acknowledged handling the Longs' financial transactions and conceded that "it wouldn't take a rocket scientist to know that they are somehow involved in [the drug trade]." (J.A. at 965.) These considerations along with the strength of the case against Petitioner make it likely that the jury would have found him guilty even assuming Petitioner's counsel could have done a better job.

### A.

As discussed already, Petitioner claims he received ineffective assistance because his counsel failed to negotiate a plea that would have resulted in a sentence of probation rather than incarceration. Petitioner would only accept an offer that guaranteed probation—after all, Holbrook informed Petitioner personally that the government might consider an offer that would leave open a distant possibility of probation and neither Petitioner nor his counsel pursued that

opportunity.[6] Petitioner's counsel was not ineffective for failing to react to a no-jailtime offer that the government never made, and Petitioner offers no evidence that his counsel (or anyone else) could have negotiated a plea that would have guaranteed no incarceration. This is particularly evident given Petitioner's significant role in the drug conspiracy.

**B.**

Petitioner also argues that his attorney did not provide effective assistance because he did not timely move for a separate trial or provide the district court sufficient evidence to order a separate trial. Neither party disputes that Mark Williams, Petitioner's counsel, filed a motion requesting a separate trial on March 5, 1997, the day before the trial began. The untimeliness of the motion did not prejudice Petitioner because the district court did not deny it as untimely filed. Rather, the district court held a conference with counsel about the motion, then entered an order denying it on March 10, 1997, because Petitioner had not demonstrated that a joint trial would prejudice him.

Petitioner argues that Williams did not adequately support the motion to sever because he failed to obtain an affidavit from his co-defendant, Robert Long, that would have expressed Long's willingness to testify on Petitioner's behalf in a severed trial. Specifically, Petitioner claims now (as he did before the trial court) that a joint trial deprived him of the right to call co-defendant Robert Long as a witness.

Along with his pretrial motion to sever, Petitioner's counsel attached an affidavit from Max Kravitz, who interviewed Robert Long. Kravitz set forth what he believed Robert Long would say on Defendant's behalf. Robert Long presumably

---

[6]Notably, Holbrook emphasized in both affidavits that Petitioner did not understand the severity of his situation. That may explain Petitioner's position.

would have testified that Petitioner had no knowledge of Robert Long's drug conspiracy. The court consulted with Robert Long's counsel to determine whether Robert Long would testify in Petitioner's defense. Robert Long's counsel represented that he did not know whether his client would assert his Fifth Amendment privilege if called as a witness in a joint trial. Subsequently, during trial, Robert Long asserted his Fifth Amendment privilege when Williams called him as a witness. Thus, no matter what Robert Long would have said, Petitioner was not prejudiced unless Petitioner can show that Robert Long would have testified on his behalf had the trial court granted the motion to sever.[7] With his habeas petition, Petitioner provided the court with an unsworn question and answer statement in which (now four years later) Robert Long answers "yes" to the question: "Prior to your joint trial with [Petitioner], had you obtained separate trials, would have you have testified on [Petitioner's] behalf?" (J.A. at 469.) This statement is not adequate to demonstrate either that Robert Long would have testified in a separate trial if the government tried Petitioner first or that if the trial court knew Robert Long would testify in separate trial, it would have granted Petitioner's motion to sever.

In general, "[t]here is a preference in the federal system for joint trials of defendants who are indicted together." *Zafiro v. United States*, 506 U.S. 534, 537 (1993). Defendants do not have a right to separate trials "simply because they have a better chance of acquittal if they [are] tried alone." *United States v. Brenig*, 70 F.3d 850, 853 (6th Cir. 1995). Courts employ a stringent test to determine whether a defendant deserves a severance. The defendant "must demonstrate: (1) a *bona fide* need for the testimony; (2) the substance of the

---

[7]Put differently, Petitioner cannot show prejudice without demonstrating that the trial court would have granted the motion to sever, and the trial court would not have granted the motion to sever unless, *inter alia*, Petitioner could show Robert Long would have actually testified in a separate trial. *See, e.g., United States v. Butler*, 611 F.2d 1066, 1071 (5th Cir. 1980).

testimony; (3) its exculpatory nature and effect, and (4) that the co-defendant will in fact testify if the cases are severed." *United States v. Butler*, 611 F.2d 1066, 1071 (5th Cir. 1980); *see also United States v. Smith*, 46 F.3d 1223, 1231 (1st Cir. 1995) (using the same four factors); *United States v. Pepe*, 747 F.2d 1632, 1651 (11th Cir. 1984) (using the same four factors).

Petitioner fails this test for two reasons. First, Robert Long's testimony would not be exculpatory. According to the question and answer sheet:

> QUESTION:    Assuming, without admitting, that you were involved in illegal activities in Florida, was [Petitioner] aware of those activities prior to August, 1995?
>
> ANSWER:       To my knowledge [Petitioner] was not aware of anything prior to 1995.

(J.A. at 469.) Yet the conspiracies for which the jury convicted Petitioner extended well beyond 1995 and, in fact, beyond Petitioner's indictment in 1996.

Second, Petitioner failed to prove that Robert Long would have testified had the court granted a severance. At the time, Robert Long faced a litany of serious drug and conspiracy charges, and prosecutors could have used his testimony against him if the government went to trial against Petitioner first. Robert Long's question and answer statement never asserts that he would have testified on Petitioner's behalf regardless of the order in which their trials occurred. Since Petitioner has not proven otherwise, one can assume Robert Long would not have waived his Fifth Amendment privilege at his peril. We have already held that a co-conspirator's promise to testify only if he receives his trial first is not a basis for a severance. *See United States v. Blanco*, 844 F.2d 344, 352-53 (6th Cir. 1988) ("Here, although Fresneda purported to waive his Fifth Amendment privilege, the waiver

was illusory because it was conditioned upon his being tried before Spinola.").

## C.

Petitioner cites a litany of alleged trial errors including (1) counsel's failure to object to elements of Karen Long's testimony; (2) counsel's failure to meet with Petitioner during trial and his failure to adequately prepare for trial; (3) counsel's failure to cross-examine Donald Ross, and (4) counsel's failure to object to the introduction of irrelevant or erroneous evidence. None of these allegations helps Petitioner demonstrate prejudice.

First, Petitioner argues that counsel should have objected to Karen Long's testimony about Petitioner's knowledge of the Longs' cocaine business. Karen Long testified that Petitioner knew about the Longs' drug enterprise, but she never explained when he learned of their involvement. Petitioner's counsel did not object to her vague response or attempt to clarify the issue during cross-examination. Regardless, her statements to government investigators indicate Karen Long would have testified that Petitioner knew the Longs distributed cocaine before their arrest in August of 1995.

Second, in his brief, Petitioner asserts that "[c]ounsel was also ineffective for failing to adequately meet with the [Petitioner] during trial. During the three weeks [sic] long trial, counsel met with [Petitioner] only three times." (Pet'r Br. at 19.) Petitioner offers no citation to the record to support his conclusion. An allegation entirely unsupported by the record cannot meet the prejudice component of the *Strickland* inquiry.

Petitioner also claims that Williams failed to adequately prepare for trial. In particular, Petitioner alleges that Williams failed to review sixteen boxes of discovery. Again, however, nothing in the record corroborates this allegation. Holbrook did state that counsel appeared unprepared for trial,

but Holbrook (a witness) did not attend the trial. Holbrook disagreed with how Williams examined him on the stand, but as the witness, Holbrook may not have the best perspective on how counsel should have questioned him. Finally, Holbrook heard a derogatory comment about Williams' performance from an unidentified person in a restaurant. Like the other unsubstantiated allegations, this gossip does not help Petitioner meet his burden.

Third, on direct examination, Donald Ross testified that his wife did not accompany him when he delivered two ounces of cocaine to Petitioner in his office. This contradicted the testimony of Marilyn Ross, who claimed that she was present and heard Petitioner claim he would sell the cocaine. Also on direct examination, Donald Ross described the Faber property transaction differently than Karen Long did.

Petitioner now claims that if counsel had cross-examined Donald Ross, "he could have gotten out before the jury that the [Petitioner] never stated he was going to sell the two ounces of cocaine delivered to him, contradicting Marilyn Ross' story." (Pet'r Br. at 19.) Petitioner also claims that "Don Ross could have refuted Karen Long's claim that she was present with Don, Robert Long, and the [Petitioner] during discussions of the Faber Avenue sale." (Pet'r Br. at 19-20.)

Petitioner argues that "counsel simply failed to bring [this] evidence before the jury," even though the government brought the same evidence before the jury during the direct examination. (Pet'r Br. at 20.) When the jury hears on direct examination the evidence a petitioner feels counsel should have developed in cross-examination, the petitioner did not suffer prejudice. *Dorsey v. Parke*, 872 F.2d 163, 166 (6th Cir. 1989); *Steven v. Bordenkircher*, 746 F.2d 342, 347 (6th Cir. 1984).

Finally, Petitioner complains of various other alleged trial errors. According to Petitioner, Williams should have

objected to the introduction of phone records and pen register information revealing telephone calls to and from Petitioner, but Williams had already unsuccessfully objected to that material earlier. His failure to make a further objection that the court would have overruled did not prejudice Petitioner.

Petitioner grumbles about counsel's failure to object to questions prosecutors asked a government agent about a land contract and related monies that Petitioner failed to disclose to the grand jury. The government introduced evidence of a land contract between the Longs and Loretta and Eugene Newsome that Petitioner prepared but never filed. Petitioner denies preparing the land contract, although that does not preclude prosecutors from asking questions about the document. Similarly, the government introduced evidence that Petitioner failed to provide the grand jury information concerning $60,000 he received from the Longs for land transaction work that helped hide the Longs' income. Petitioner complains about counsel's failure to object to questions about this money, but since the money was very relevant to the government's case, it seems probable that the court would have overruled any objection.

Since Petitioner has not established prejudice, we need not consider whether counsel's performance was constitutionally inadequate. *See Watson*, 784 F.2d at 726.

For all the aforementioned reasons, we **AFFIRM** the district court.