NOT RECOMMENDED FOR PUBLICATION
File Name: 19a0391n.06

Nos. 17-6263/6273/6284/6288

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **FILED** |
| | ) | Jul 31, 2019 |
| Plaintiff-Appellee, | ) | DEBORAH S. HUNT, Clerk |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| CHARLES LARRY BATES, et al., | ) | COURT FOR THE WESTERN |
| | ) | DISTRICT OF TENNESSEE |
| Defendants-Appellants. | ) | |
| | ) | |
| | ) | |

BEFORE:      ROGERS, DONALD, and THAPAR, Circuit Judges.

ROGERS, Circuit Judge.  Larry Bates held himself out to the public as an apocalyptic economist committed to helping customers safeguard their wealth by purchasing precious metals from his company, First American Monetary Consultants.  The reality was quite different.  First American Monetary Consultants regularly failed to deliver gold and silver coins to its customers after they had mailed checks or wired money for their orders, and it ultimately defrauded hundreds of people to the tune of over twenty million dollars.  After a joint jury trial, Larry Bates and three of his family members were convicted of mail fraud, wire fraud, and conspiracy to commit mail and wire fraud.  In this consolidated appeal, the defendants challenge their convictions on multiple grounds, including sufficiency of the evidence and the allegedly improper denial of their motions for severance.  Defendants also argue that their sentences were procedurally and substantively unreasonable, that they should not have been held joint and severally liable for forfeiture, and that

the forfeiture amount was disproportionately excessive in violation of the Eighth Amendment. None of their arguments succeeds.

## I.

First American Monetary Consultants acted as a broker for precious metal transactions, purchasing gold and silver coins from wholesale suppliers and selling them to individuals looking for investment opportunities. Established in 1984, First American was initially incorporated in Colorado and subsequently became incorporated in Tennessee. Its founder, President, and CEO, Dr. Larry Bates, was a former member of the Tennessee House of Representatives with a doctorate in Christian education. Larry Bates and his wife, Barbara Bates, were First American's sole shareholders.

First American began as a small consulting business consisting of Larry Bates and a secretary. It eventually expanded, in no small part due to the public outreach conducted by Larry Bates. Bates had turned his dissertation into a best-selling book entitled "The New Economic Disorder," and he capitalized on that success by becoming a frequent guest on Christian television shows and radio programs by the mid-2000s. First American also organized conferences throughout the country in which Larry Bates would speak to prospective customers. The pitch was always similar. Larry Bates would warn his audience about an imminent economic disaster, characterizing it as an "end time scenario" out of the Book of Revelation that would destroy the value of currency and threaten the savings of everyone invested in the stock market. First American offered a solution. With the assistance of its "economists," First American's term for its sales staff, customers could invest in precious metals that would not lose value in an economic collapse. First American also sold other products to help its customers prepare for Armageddon, including Larry Bates' books and freeze-dried food.

Each of Larry Bates' immediate family members worked for First American. Barbara Bates served as the Vice President and was responsible for maintaining the company's financial records. The couple has two sons, Charles Edward Bates ("Chuck Bates") and Robert Bates ("Bob Bates"). Chuck Bates was a Senior Monetary Consultant and Larry Bates' second-in-command, whose responsibilities included selling precious metals to customers, hiring and training new salesmen, and calculating sales commissions. Bob Bates also served as a Senior Monetary Consultant, but his role was limited to that of a salesman. Kinsey Bates (formerly Kinsey Brown) was hired in 2009 and became Larry Bates' personal assistant in 2010. She was responsible for handling customer calls, picking up First American's mail from the post office, sorting mail, and delivering mail to Larry Bates. Kinsey married Bob Bates in October of 2012.

All of the defendants worked in First American's Memphis office. Chuck and Bob Bates had offices in a locked hallway behind the receptionist's desk, where the First American economists worked as well. At the end of the hallway there was another locked door that opened into an executive suite where Larry, Barbara, and Kinsey Bates worked. Kinsey Bates stayed with a First American employee named Sherry Barnett in the "outside area" of the executive suite, while Larry and Barbara Bates had separate offices within it. The executive suite also contained a locked shipping room with two safes, and only Larry, Bob, and Chuck Bates knew the combinations. Larry, Barbara, Chuck, Bob, and Kinsey Bates were each able to access the executive suite, and other economists could only do so when accompanied by a member of the Bates family or another authorized employee. If an economist had a message or customer order to provide to Larry Bates, then the standard practice was to "slip it under the door where it was retrieved by somebody in the executive suite."

In addition to running First American, Larry Bates served as the CEO and majority shareholder of Information Radio Network ("IRN"), a Tennessee corporation and First American's affiliate. Larry Bates used IRN as an additional source of advertising for First American. A couple of the other Bates family members were also involved in managing IRN. Barbara Bates was a director, and Chuck Bates worked as an officer and news director for the company. Larry Bates also produced a radio show through IRN called "News and Views," and Chuck Bates assisted as a co-host.

The process for ordering precious metals through First American would work as follows. Customers typically contacted First American after hearing Larry Bates speak on a TV show, on a radio program, or at a First American conference. First American would respond by mailing an information packet and assigning an economist to advise the customer on how to invest in gold and silver coins. After the customer placed an order, First American would fill out a transaction form and instruct the customer to either send a check through U.S. mail or pay through a wire transfer. Larry Bates was in charge of purchasing the requested coins from a wholesale supplier. First American would then send order confirmations through U.S. mail advising customers that they should expect to wait twenty-five to forty-five business days for their coins to be delivered.

Although customers were initially drawn to First American based on Larry Bates' reputation as a Christian, many of them became disillusioned after experiencing delivery delays of months or years. The volume of customer complaints increased from 2009 to 2013, as the orders for hundreds of customers remained partially or completely unfulfilled. Customers attempted to obtain their coins by contacting First American employees—including each of the defendants— through phone calls, letters, emails, and voicemail messages. One customer became desperate enough that she traveled to First American's Memphis office to pick up her coins in person.

Another accused Larry Bates of operating a "Ponzi scheme." Others hired attorneys and threatened to contact the attorney general about First American's bad business practices.

Eventually, the criticism took a toll on the company. Customers had filed an increasing number of complaints with the Better Business Bureau and the Tennessee Department of Consumer Affairs between 2008 and 2013, prompting the Better Business Bureau to downgrade First American's rating from an "A plus" in 2008 to a "D plus" in 2010. The downgrade caused First American to lose its accreditation with the Better Business Bureau, and its rating dropped to an "F" in 2013. Multiple First American employees resigned during that same period due in part to the stress of handling a high volume of customer complaints. Larry Bates lost the support of Jonathan Bernis, the host of a TV program called "The Jewish Voice," who had invested in First American and frequently invited Bates to speak on his show. Customers with unfulfilled orders also brought a class action lawsuit against Larry Bates and his family, seeking to recover the value of their investments.

In 2015 and 2016, the Government brought the following charges against the defendants: twenty-eight counts of mail fraud, seventeen counts of wire fraud, and one count of conspiracy to commit mail and wire fraud against Larry Bates; thirteen counts of mail fraud, three counts of wire fraud, and one count of conspiracy to commit mail and wire fraud against Chuck Bates; five counts of mail fraud, three counts of wire fraud, and one count of conspiracy to commit mail and wire fraud against Bob Bates; and two counts of aiding and abetting wire fraud and one count of conspiracy to commit mail and wire fraud against Kinsey Bates. After a joint jury trial, the defendants were convicted of all charges. For the purposes of this appeal, the following portions of the trial and sentencing are relevant.

**A.**

Chuck, Bob, and Kinsey Bates moved to sever their trials from that of Larry Bates. Before trial, their argument for severance was that Larry Bates possessed exculpatory information that they would be unable to present in a joint trial if Larry Bates were to exercise his Fifth Amendment right against self-incrimination. The district court denied severance on that ground.

Larry Bates testified during trial, and the defendants accordingly revised their reasons for requesting severance. Throughout the trial, the defendants moved to sever on multiple grounds, including because the evidence against Larry Bates allegedly prejudiced the others' defenses and because the joint trial precluded the admission of information concerning Larry Bates' medical treatment that Kinsey Bates claimed would have been admissible if she were tried separately. The district court denied each of the severance motions. It determined that the "[d]efenses [we]re not antagonistic to one another," and the defendants' original reason for requesting severance did not apply in light of Larry Bates' trial testimony. Because "none of the other sort of classic reasons for severance are present at all," the court concluded that the defendants' trials were "properly joined."

**B.**

In 2013, the district court overseeing the civil class action lawsuit against the Bates family appointed attorney John Ryder to serve as a receiver for First American and IRN. As a receiver, Ryder's responsibilities included taking charge of the companies' assets, evaluating the viability of the businesses, determining whether the businesses should be liquidated, and reporting any "irregular activity" to the relevant authorities. Ryder proceeded to review First American's business records, which were largely "in disarray." First American lacked the "accounting software that you would expect to find in a business," and employees had failed to keep an

inventory of precious metals being held by the company. Despite the poor record-keeping, Ryder eventually determined that First American's liabilities exceeded its assets. Both First American and IRN owed rent for their offices, and First American had failed to keep up with payments for payroll taxes and the health savings accounts of its employees. Because there was not enough money in First American's account to "keep [First American] going," Ryder decided to shut down the company.

In the course of his review, Ryder also examined bank records and ledgers for First American and IRN. He learned that First American's funds had been commingled with IRN's funds. First American had advanced $4.5 million to cover expenses for IRN, of which IRN repaid approximately $400,000. Ryder also determined that multiple Bates family members had used First American funds for their personal benefit. Larry Bates withdrew approximately $2.6 million from First American and deposited it into his account with R.J. O'Brien, a commodities trading firm. The account balance eventually rose to over $7 million, at which point Bates repaid the $2.6 million to First American and kept the profit for himself. Ryder claimed that Larry Bates used the money to purchase personal assets, such as a "plantation style house" on a 290-acre tract of land that included three other houses (one of which was used by Chuck Bates).

First American funds were also used to purchase a $10,000 diamond ring for Kinsey Bates, to cover the expenses for a trip to New York taken by Kinsey and Bob Bates, to purchase Broadway show tickets, and to pay for a Caribbean cruise. At least some of the money was paid back by crediting the advances against sales commissions. Ryder testified that he nonetheless found the transactions to be "unusual" because the company had been insolvent since 2007, and a "significant number" of customer orders remained unfulfilled while members of the Bates family were using First American funds. The withdrawals would have also exacerbated First American's

inability to fulfill precious metal orders because the price of gold had risen between 2008 and 2011.

Although First American's record-keeping was generally poor, Ryder found records for filled and unfulfilled customer orders that he used to calculate what First American owed its customers. To do so, he asked Sherry Barnett, a First American employee, to prepare a spreadsheet compiling information about customer orders, including the amount of coins that were ordered and whether each order had been partially or completely fulfilled. Ryder then verified the accuracy of Barnett's spreadsheet in the following ways: (1) an accountant "perform[ed] a test on it," which demonstrated the spreadsheet's accuracy; (2) Ryder compared information about unfulfilled customer orders that he received through customer phone calls to the information on the spreadsheet, concluding that "the numbers matched up"; (3) Ryder compared the spreadsheet to records from the plaintiffs' counsel in the civil class action lawsuit; and (4) Ryder compared the spreadsheet to information about unfulfilled customer orders that Larry Bates had produced during the civil litigation. As a result, Ryder calculated that "the shortfall between the orders placed and the orders filled was $26 million," with "[s]everal hundred" orders remaining unfulfilled at the time of his receivership.

After the calculation was completed, Ryder learned that Barnett had stolen approximately $420,000 worth of coins from First American between 2008 and 2013 and sold a portion of them to a precious metals broker in Louisiana, while burying the rest in her backyard. Ryder immediately terminated Barnett and filed a lawsuit to recover the stolen assets. He also reviewed Barnett's personal financial records and bank statements, and the review satisfied him that the amount of coins she confessed to stealing was accurate. Despite Barnett's theft, Ryder remained

confident in the reliability of his unfulfilled order assessment because he had "check[ed the spreadsheet] out [in] so many different ways," all of which demonstrated its accuracy.

## C.

During his receivership, Ryder hired Rhett Butler, a certified public accountant, to assist with the following tasks: (1) the creation of balance sheets for First American from the end of 2007 to September of 2013; (2) the preparation of a "schedule of receipts and disbursements" from the company for that same time period; (3) the preparation of a schedule of transactions between First American and the Bates family members, along with transactions between First American and IRN; and (4) the testing of the "completeness and accuracy" of Barnett's schedule of unfulfilled customer orders. Rhett Butler's findings were eventually included in a receivership report that also contained Ryder's assessment of First American.

Before trial, the Government notified the defendants that it planned to call Rhett Butler as an expert witness to testify about First American's insolvency, about its unfulfilled orders for precious metals, and about its other orders for precious metals. The defendants jointly moved to exclude Butler's testimony for multiple reasons, three of which are relevant for this appeal. Butler's testimony was allegedly inadmissible because his methodology was insufficiently reliable under FED. R. EVID. 702, given that Butler used Barnett's inherently unreliable spreadsheet and that his test to verify the spreadsheet's accuracy involved a high error rate. The defendants also criticized the fact that Butler only examined First American's solvency during a subset of the time period named in the indictment, which they claimed would make his testimony irrelevant under FED. R. EVID. 401 and unduly prejudicial under FED. R. EVID. 403.

After an evidentiary hearing, the district court denied the motion to exclude Butler's testimony. The court determined that Butler's testimony about First American's insolvency was

relevant, and the fact that it pertained to a subset of the applicable time period did not make it inadmissible under FED. R. EVID. 403. Furthermore, the court concluded that "the methodology employed by Mr. Butler is sufficiently reliable under the standards established by FRE 702." Butler's report complied with the standards of the American Institute of Certified Public Accountants, and Butler provided a clear explanation of the methodology that he relied on to test the accuracy of Barnett's spreadsheet. Although the defendants "identified and probed various perceived weaknesses in Mr. Butler's report," the court determined that "these questions primarily concern the weight of the testimony, not its admissibility."

During the trial, Butler testified about how he helped Ryder calculate First American's liability for unfulfilled customer orders by examining the accuracy of Barnett's spreadsheet with information about customer orders. To do so, Butler "selected and tested about 191 customer files" out of a total of 3,500. The sample included "every customer that had an unfulfilled liability greater than $50,000," "which accounted for approximately $12 million of the unfulfilled liability." It also included a subset of "customers that had liabilities less than 50,000," in addition to a subset of customers with fulfilled orders. Once he had selected the sample, Butler reviewed the information in each customer's file to verify that the spreadsheet's information for that order—including the amount of precious metals that was requested and delivered—was accurate. The customer files contained a combination of order tickets with "details of what the customer ordered" and paid, copies of customer checks, packing lists, shipping documents, and "verification of tracking numbers" that would indicate whether the precious metals were shipped. Of the 191 customer orders that Butler examined, 24 had inaccurate information on the schedule, which amounted to an error rate of "less than 10 percent." Butler testified that such an error rate "was not significant enough" to render Barnett's customer order spreadsheet inaccurate.

Based on his review, Butler concluded that First American's liability for unfulfilled customer orders was in the millions of dollars for each year between 2008 and 2013. This was consistent with the discrepancy between the amount of money that First American spent on precious metals between 2008 and 2013 (approximately fifty-six million dollars) and the amount of money that First American received from customers for precious metal orders (approximately eighty-three million dollars), a discrepancy that could not be explained by the fact that First American would have charged commissions and earned a profit on each order.

Butler also corroborated Ryder's assessment of First American's insolvency. Butler had reviewed First American's bank statements, vendor invoices, customer files, copies of checks, deposit slips, and cash ledgers to create balance sheets that weighed the value of First American's assets against its liabilities. The review illustrated that cash, First American's main asset, was "decreasing substantially between 2008 and September 30, 2013." First American's liabilities exceeded its assets during that same period, and Butler calculated that there was a deficit each year ranging from $2.8 million to $21.6 million. Furthermore, Butler corroborated Ryder's testimony that a number of Bates family members had withdrawn money from First American or charged the company credit card for personal expenses, including to fund Larry Bates' account at R.J. O'Brien and to pay for trips to New York and the Virgin Islands. First American's operating expenses and advances to the Bates family were so costly that even if its liability for unfulfilled customer orders went away, it would still have been operating in the red from 2011 through 2013.

**D.**

Jack Dietz, an investigative support analyst for the U.S. Postal Inspection Service, conducted his own review of unfulfilled customer orders and prepared transaction charts summarizing the information. He based the charts on First American records, which he verified

by sending a survey to every customer with an unfulfilled order amount of over five or ten thousand dollars. Dietz also compared his findings with records that Ryder had collected during his receivership investigation (including the results from a separate customer survey), and conducted telephone calls and customer interviews to "confirm if the information was accurate about their unfulfilled status." 368 customers had unfulfilled orders, and Dietz's investigation verified the unfulfilled status of 321 of those customers (or 87 percent). Once the transaction charts were completed, Dietz calculated the total loss to customers to be over $21 million. He verified 97 percent of that figure, with the higher verification rate attributable to the fact that some of the unverified customers suffered a "very low" loss. The total loss calculation was based on the original purchase price of the coins, and it did not incorporate any profit customers could have made by trading the coins "at a higher value."

During the trial, the Government asked Dietz to read the information on individual transaction charts for over forty customers with unfulfilled orders, including how many coins the customers ordered and the amount of loss they suffered when the coins were not delivered. Dietz also provided information about how much each defendant earned between 2008 and 2013, and he corroborated Ryder and Butler's testimony about Larry Bates' withdrawal of First American funds for his personal benefit.

**E.**

The Government called over forty customers with unfulfilled orders to testify about the delivery delays they experienced, their attempts to contact defendants, and the losses they suffered as a result of the alleged fraud. Many customers experienced lengthy delivery days of months or years. They persistently contacted First American employees about their unfulfilled orders, initially by reaching out to their sales representatives. When that proved ineffective, they would

often attempt to contact Larry Bates. Kinsey Bates acted as a buffer between the customers and Larry, and both she and Larry proved difficult to reach. One customer testified that Kinsey "might take a message," assuming she answered her phone, "but then we would never hear back from Larry." Others confirmed that the defendants were unresponsive to complaints and "seemed to think it was very unreasonable" that customers were concerned about their unfulfilled orders.

To mitigate customer concerns, the defendants would offer excuses for the delivery delays, claiming that the orders had to be returned due to the inferior quality of the coins, that the coins were tied up in customs, that there were problems with the U.S. Mint, and that the delays were a result of Larry Bates' health problems. Larry Bates presented testimony demonstrating that he had experienced health problems during the relevant time period. However, the Government called witnesses who disputed the accuracy of the other reasons for delay. Representatives from First American's wholesale suppliers testified that they were not aware of First American's returning coins due to inferior quality and that they had not experienced problems supplying First American with coins. In the unlikely event that there was a metal shortage requiring the U.S. Mint to limit the availability of coins, the president of one supplier stated that it would take a couple weeks to a month at most before the fulfillment of orders could be resumed.

Larry Bates and his sales force employed other strategies in apparent attempts to ward off complaints. They convinced multiple customers to swap undelivered coins from a previous order for a different set of coins, which would then not be delivered. The defendants also responded to customer concerns by making misleading or outrightly false statements. Larry Bates told one customer that First American had "a 99.9 percent satisfaction rate with [its] clients" and threatened to bring a defamation lawsuit if the customer continued to complain. On a different occasion, Larry Bates emailed a customer confirming that her full coin delivery was on the way, after which

First American delivered a mere fraction of the promised order. On yet another, Kinsey Bates told a customer that he was "next on the list" for an order delivery that never arrived.

Former First American employees confirmed that the defendants had ample notice of the delivery problems. They testified that the volume of customer complaints rose "astronomically" from 2010 to 2013, to the point that one economist spent a "majority" of his time dealing with customer complaints. Larry and Chuck Bates would tell First American employees to provide excuses for the delays. At the direction of Chuck Bates, economists began referring customers with unfulfilled orders who were threatening legal action to Kinsey Bates. The Bates family appeared to be frustrated with the complaints. Arti Denise Rikard, Chuck Bates' former secretary, claimed that "Chuck would become agitated that [customers] were calling and asking for the metals," and "toward the end he didn't want to talk to them." Another former First American employee testified that when he asked Larry Bates about a complaint, Bates stormed into his office and commanded him to refrain from "ever stop[ping] me again and ask[ing] me about any clients."

**F.**

The defendants moved for a judgment of acquittal under FED. R. EVID. 29 at the close of the Government's case.[1] Larry Bates argued that the Government had failed to establish the substantive counts of mail or wire fraud because there was insufficient evidence showing that the defendants acted with the requisite intent to defraud. Larry Bates also questioned whether the Government had presented sufficient evidence tying him to specific counts of mail and wire fraud, given his lack of personal interaction with many of First American's customers. With respect to the conspiracy charged, Larry Bates claimed that there was insufficient evidence to show that the

---

[1] The defendants renewed their Rule 29 motions at the close of all evidence, and the district court summarily denied the motions.

defendants had entered an agreement to refrain from delivering coins. At most, the evidence showed that "a business failed," which is "not a crime."

The other defendants moved for acquittal based on similar reasons. Chuck Bates argued that there was insufficient evidence of an agreement or of an intent to defraud, and claimed that "[a]ll of [his] actions were as an employee following directions." Bob Bates argued that he did "nothing" wrong and simply didn't realize that Larry Bates was defrauding First American's customers. Kinsey Bates challenged the sufficiency of the evidence for the charge of aiding and abetting wire fraud, arguing that the Government failed to show that she had made materially false representations to customers or that the allegedly false representations were made in furtherance of a fraud scheme. With respect to the conspiracy charge, Kinsey Bates claimed that there was insufficient circumstantial evidence tying her to an agreement to defraud First American's customers.

The district court denied the defendants' Rule 29 motions. It determined that there was sufficient evidence of a conspiracy, given the testimony demonstrating that the defendants continued to sell coins while on notice that an extensive number of prior customers had unfulfilled orders. There was also sufficient evidence to show that Larry Bates was guilty of each individual count of mail and wire fraud because the customers "relied on statements from Dr. Bates" during his public appearances before investing with First American, and Larry would respond to customer complaints through email or on the telephone. With respect to the charges of mail and wire fraud against the Chuck, Bob, and Kinsey Bates, the district court determined that the evidence of their material misrepresentations to customers was sufficient to warrant a denial of acquittal.

**G.**

The district court sentenced Larry Bates to 262 months of imprisonment, Chuck Bates to 151 months of imprisonment, Bob Bates to 151 months of imprisonment, and Kinsey Bates to 63 months of imprisonment.

**II.**

**A. Sufficiency of the Evidence for Larry Bates' Convictions**

The Government presented sufficient evidence for a rational trier of fact to find Larry Bates guilty of mail fraud, wire fraud, and conspiracy to commit mail and wire fraud. The Government called over forty customers with unfulfilled orders, many of whom testified that they had complained to Larry Bates directly and received misleading statements in response. Multiple former First American employees confirmed that Larry Bates was aware of the rising number of customer complaints and appeared to be unwilling to address them. On several occasions, Bates became aggravated when asked to deal with customer complaints. He told his employees to provide excuses for the delivery delays, and the Government called witnesses from precious metal suppliers and the U.S. Mint disputing the accuracy of those excuses. There was also evidence that Bates personally profited from First American's failure to deliver precious metal orders, given that he withdrew First American money to fund his commodities trading account and cover various personal expenses.

The Government's proof of intent was sufficient, even though it was circumstantial. "Because it is difficult to prove intent to defraud from direct evidence, a jury may consider circumstantial evidence of fraudulent intent and draw reasonable inferences therefrom." *United States v. Davis*, 490 F.3d 541, 549 (6th Cir. 2007) (internal alteration and quotation omitted). Fraudulent intent can be inferred, for instance, "from efforts to conceal the unlawful activity, from

misrepresentations, from proof of knowledge, and from profits." *Id.* The Government presented evidence showing that Larry Bates had attempted to ward off customer complaints by misrepresenting the reasons for the delays, that he knew about the increasing volume of customer complaints, and that he profited from First American's bad business practices. There was therefore sufficient circumstantial evidence of intent to enable a rational trier of fact to convict Bates of all charged counts.

Sherry Barnett's theft does not alter this determination. The investigators did not rely on Barnett's spreadsheet without taking steps to verify it or calculate how many lost coins were attributable to the theft. Ryder, Butler, and Dietz testified that they tested the spreadsheet for accuracy in multiple ways, with Dietz's review verifying that 97 percent of the total customer loss calculation was accurate. Dietz also investigated whether Barnett had been dishonest about how many coins she stole by contacting the Mississippi Gambling Commission to determine if she had gambled additional profits, by reviewing bank records and credit card records to see if Barnett had sold coins in places other than Louisiana, and by visiting her "very modest" home. Each of these measures convinced Dietz that Barnett had stolen approximately $400,000 worth of coins, well short of what would have been necessary to account for the total customer loss of over $20 million. Furthermore, the theory that Sherry Barnett's theft was responsible for the unfulfilled customer orders is inconsistent with testimony indicating that Larry Bates directed his employees to provide excuses for delivery delays, instead of being surprised that coin orders were failing to reach customers.

Even if it were possible to infer that Larry Bates was simply the victim of Barnett's fraud scheme, doing so would require adopting a highly critical reading of the Government's evidence. Such a reading would be inconsistent with the deferential standard of review for sufficiency

challenges, according to which a conviction should be affirmed if, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found essential elements of the crime." *United States v. Kernell*, 667 F.3d 746, 750 (6th Cir. 2012) (quoting *United States v. Kuehne*, 547 F.3d 667, 669 (6th Cir. 2008)). For these reasons, there was sufficient evidence to support Larry Bates' convictions.

**B. Sufficiency of the Evidence for Bob Bates' Conspiracy Conviction**

The Government presented sufficient circumstantial evidence of Bob Bates' knowledge of and participation in the conspiracy to defraud, and a rational trier of fact could have accordingly found Bob Bates guilty on the conspiracy count. Customers testified that Bob Bates continued to advise them to buy coins with First American, even after he knew that their prior orders remained unfulfilled. There was also testimony from both customers and former First American employees demonstrating that Bates knew about the unfulfilled orders, with one economist claiming that Bates told him to "leave it alone" in response to a question about a customer complaint. Bob Bates and his wife, Kinsey Bates, both withdrew money from First American for their personal use while the company was insolvent and owed money to its customers. Based on this evidence, a rational trier of fact could conclude that Bates had knowledge of the conspiracy and voluntarily joined it, despite First American's poor record-keeping.

It is true that the Government did not present evidence showing that Bob Bates regularly contacted Larry Bates or Sherry Barnett about First American's financial affairs or shipping practices. However, multiple facts supported an inference that Bob Bates had knowledge of First American's unfulfilled customer orders, including the fact that Bob Bates was Larry Bates' son, that he was married to Larry Bates' personal assistant, and that he had access to the executive suite. When codefendants are immediate family members and business partners, we have determined

that their close relationship "raises a permissible inference that they might share information concerning their business activities." *United States v. Warshawsky*, 20 F.3d 204, 209 n.2 (6th Cir. 1994). Viewing the evidence in the light most favorable to the Government, there was sufficient evidence for the jury to draw such an inference and find Bob Bates guilty of conspiracy to commit mail and wire fraud.

### C. Sufficiency of the Evidence for Kinsey Bates' Convictions

There was sufficient circumstantial evidence for a rational trier of fact to conclude that Kinsey Bates acted with the intent to defraud customers. The evidence supporting Kinsey Bates' specific intent involved testimony about how she profited from the fraud by receiving a salary increase when she became Larry Bates' personal assistant, about how she was one of the few First American employees authorized to access the executive suite, and about how she made (at best) misleading statements to customers related to First American's supposedly clean track record in fulfilling customer orders. Additional evidence of her guilt included the fact that her salary more than doubled from $29,992 in 2010 to $71,205 in 2011 after she became Larry Bates' personal assistant, that a former First American employee warned her that "something is just not right" shortly after Kinsey started working for the company, that Kinsey was often unresponsive to a high volume of customer complaints, and that Chuck Bates assigned Kinsey to deal with particularly angry customers who were threatening legal action.

Our decision in *United States v. Leon*, 534 F.2d 667 (6th Cir. 1976), does not undermine the sufficiency of the evidence against Kinsey Bates. In *Leon*, we determined that "a verdict of guilty cannot stand" when it rests on circumstantial evidence from which a jury could "infer either facts tending to prove the defendant's guilt, or facts tending to prove his innocence." *Id.* at 677. However, we rejected this language in *United States v. Stone*, 748 F.2d 361 (6th Cir. 1984), where

we "h[e]ld once and for all that our court on appeal will reverse a judgment for insufficiency of evidence only if this judgment is not supported by substantial and competent evidence upon the record as a whole." *Id.* at 363. This rule "applies whether the evidence is direct or wholly circumstantial." *Id.*; *see also United States v. McNeil*, 106 F. App'x 294, 299 (6th Cir. 2004). After *Stone*, the Government's circumstantial evidence of Kinsey Bates' knowledge of and participation in the conspiracy to defraud is enough for a rational trier of fact to find her guilty, even if the same circumstantial evidence could support an inference of innocence.

Similarly, the Third Circuit's decision in *United States v. Thomas*, 114 F.3d 403 (3d Cir. 1997), does not support Kinsey Bates' position. In *Thomas*, the Third Circuit reversed a defendant's conviction for conspiring to possess and distribute narcotics because there was insufficient evidence that the defendant knew about the specific object of the conspiracy. *Id.* at 405. Although the defendant "knew that he was somehow involved in an illicit activity," the Third Circuit determined that there was insufficient evidence to show that he "knew that the purpose of the agreement was . . . the possession of a controlled substance with intent to distribute." *Id.* However, the Third Circuit later overruled *Thomas*, "specifically disavow[ing]" the idea that a conspiracy conviction could be reversed "even though a jury could rationally conclude that the defendant knew the subject of the [charged] conspiracy was drugs." *United States v. Caraballo-Rodriguez*, 726 F.3d 418, 431–32 (3d Cir. 2013) (en banc).

Even without the reversal, the facts of *Thomas* are distinguishable from this case. In *Thomas*, the defendant did not have a prior relationship with his alleged co-conspirators, and "the record d[id] not show anything about the substance of the calls" that the Government attempted to use to show that the defendant knew about the conspiracy. *Thomas*, 114 F.3d at 406. In contrast, Kinsey Bates was closely involved with the other defendants for a number of years, was on notice

of the problems with First American's coin deliveries, and used First American funds for her personal benefit. For these reasons, there was sufficient evidence for a rational trier of fact to conclude that Kinsey Bates acted with the intent required for a conviction on the conspiracy and wire fraud charges.

### D. Denial of Motions for Severance

The district court did not abuse its discretion in denying the defendants' motions for severance.

First, Larry Bates' conduct and trial testimony were not so prejudicial as to warrant severance. With respect to Larry Bates' conduct, Chuck and Bob Bates fail to specify what Larry Bates did that caused them prejudice. "When a defendant seeks severance, he has a heavy burden of showing specific and compelling prejudice." *United States v. Causey*, 834 F.2d 1277, 1287 (6th Cir. 1987) (citing *United States v. Bilby*, 752 F.2d 1116, 1123 (6th Cir. 1985)). Simply characterizing a codefendant's conduct as "outrageous" or "bizarre" is not enough to satisfy that burden. With respect to Larry Bates' testimony, Chuck and Bob Bates similarly fail to explain precisely how the testimony prejudiced their defenses. It is not enough to claim that Larry Bates' testimony undermined the credibility of the rest of his family members. As we have emphasized, "defendants are not entitled to a separate trial simply because they may have a better chance of acquittal if they were tried alone." *United States v. Breinig*, 70 F.3d 850, 853 (6th Cir. 1995) (relying upon our holding in *United States v. Warner*, 971 F.2d 1189, 1196 (6th Cir. 1992)).

Second, the district court did not abuse its discretion in denying Chuck Bates' motion for severance, despite the fact that the joint trial resulted in the admission of prejudicial evidence that would arguably not have been admissible against Chuck Bates in a separate trial—including photographs of Larry Bates' home, customer complaints submitted to the Better Business Bureau,

and evidence of Larry Bates' use of First American funds to make a personal profit with his account at R.J. O'Brien. We have "recognize[d] that, in a joint trial, there is always a danger that the jury will convict on the basis of the cumulative evidence rather than on the basis of the evidence relating to each defendant." *United States v. Warner*, 690 F.2d 545, 553 (6th Cir. 1982). Nonetheless, we "adhere to the view . . . that '[t]he jury must be presumed capable of sorting out the evidence and considering the case of each defendant separately.'" *Id.* (quoting *United States v. Frazier*, 584 F.2d 790, 795 (6th Cir. 1978). Furthermore, while the Government presented evidence against Larry Bates during the joint trial that was prejudicial to Chuck Bates' defense, much of it pertained to acts in furtherance of the conspiracy and so would have been admissible against Chuck Bates if he had been tried separately. Any potential prejudice to Chuck Bates' defense caused by the admission of evidence against Larry Bates in the joint trial was accordingly minimal. We came to a similar determination in *United States v. Walls*, 293 F.3d 959 (6th Cir. 2002), where a defendant moved for severance based on the admission of allegedly prejudicial evidence offered against his codefendant during a joint trial. *Id.* at 966. We affirmed the district court's denial of the motion because the challenged spillover evidence was relevant to a conspiracy charge against both defendants and therefore "would have been admissible against [the defendant] in a separate trial." *Id.* The same reasoning applies here, and district court did not abuse its discretion in denying severance on this ground.

Third, Bob Bates' challenge to the district court's reliance on *Ross v. United States*, 339 F.3d 483, 492–93 (6th Cir. 2003), in its denial of his motion to sever is unpersuasive. *Ross* involved a motion for severance based on the need for exculpatory testimony from a codefendant. *Id.* The district court relied on *Ross* because the defendants originally requested severance to ensure that they could call Larry Bates as a witness. However, the need to question Larry Bates

proved to be a non-issue. Larry Bates decided to waive his Fifth Amendment right against self-incrimination and testify during the joint trial, so that Bob Bates had the opportunity to obtain any potentially exculpatory information from Larry Bates during his testimony. For this reason, Bob Bates' defense was not prejudiced by an inability to call Larry Bates as a witness, and his *Ross* argument is insufficient to warrant severance.

Fourth, the district court did not abuse its discretion in determining that the defenses were not so antagonistic to one another as to require severance. "Hostility among defendants or the attempt of one defendant to save himself by inculpating another does not require that defendants be tried separately." *United States v. Fields*, 763 F.3d 443, 457 (6th Cir. 2014) (quoting *Warner*, 971 F.2d at 1196). Rather, proving that severance is warranted based on antagonistic defenses requires the defendant "to show that an antagonistic defense would present a conflict so prejudicial that defenses are irreconcilable, and the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty." *Id.* (quotation omitted).

The defenses at issue here are less antagonistic than the defenses at issue in *United States v. Breinig*, 70 F.3d 850 (6th Cir. 1995), a case that illuminates what is required to satisfy the standard for severance. *Breinig* involved a former husband and wife who were jointly tried on tax evasion charges. The ex-wife presented a defense of diminished capacity and introduced evidence of her ex-husband's adultery, alienation of the couple's children, and mental abuse, none of which would have been admissible if he had been tried separately. We reversed the conviction, stressing that *Breinig* was an "exceptional" case involving "impermissible and highly inflammatory evidence of [the ex-husband's] bad character," which would have been entirely inadmissible if he had been tried separately for tax evasion. *Breinig*, 40 F.3d at 853. This case is distinguishable from *Breinig*. The Bates' defenses did not involve spillover evidence that was comparably

prejudicial to the *Breinig* evidence, and their defenses were not so antagonistic as to be irreconcilable. The district court did not abuse its discretion in denying severance on this ground.

Fifth, although Kinsey Bates arguably possessed a lower degree of culpability in comparison to her codefendants, that is not enough to show that the district court abused its discretion in denying her motion for severance. Trying "many defendants" together "in a complex case [with] markedly different degrees of culpability" heightens the risk of prejudice and may warrant severance. *Zafiro v. United States*, 506 U.S. 534, 539 (1993). However, a district court's denial of a motion to sever is reviewed for an abuse of discretion. *Walls*, 293 F.3d at 966. If some prejudice is shown, "Rule 14 does not require severance," but rather "leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion." *Zafiro*, 506 U.S. at 538–39. The district court's denial of Kinsey Bates' motion for severance did not exceed that discretion.

### E. Admission of Rhett Butler's Testimony

The district court did not abuse its discretion in admitting the expert testimony of Rhett Butler under FED. R. EVID. 401, 403, or 702. First, Butler's testimony was relevant under FED. R. EVID. 401 because Butler provided an assessment of First American's insolvency, which among other things helped to explain why the defendants continued to take on new customers: they needed the money to pay off the unfulfilled orders from previous customers. The fact that Butler's assessment was limited to a subset of the time period charged in the indictment does not undermine this determination. The indictment charged the defendants with operating a conspiracy from 2002 through 2013, while Butler analyzed First American's solvency from 2007 through September of 2013. Butler's assessment accordingly applied to a significant portion of the relevant time period, and it would have assisted the jury in understanding the Bates family's alleged fraud scheme.

Second, the fact that Butler focused on a subset of the relevant time period did not make his testimony inadmissible as unfairly prejudicial, confusing, or misleading to the jury under FED. R. EVID. 403. Butler provided a thorough, step-by-step explanation of how he analyzed First American's records and tested the accuracy of Barnett's spreadsheet of unfulfilled customer orders. To the extent that the defendants were concerned about the accuracy of Butler's assessment, their concerns would have been adequately addressed through cross-examination. The district court did not abuse its discretion in admitting the testimony under FED. R. EVID. 403.

Third, the district court did not abuse its discretion in admitting Butler's testimony as expert testimony under FED. R. EVID. 702. Butler is a certified public accountant with nearly a decade of professional experience. He testified that his methodology complied with the standards set forth by the American Institute of Certified Public Accountants. During the trial, he was asked about the concerns that the defendants raise on appeal, including whether Sherry Barnett's involvement in creating the spreadsheet affected its accuracy and whether the error rate was high enough to make his test unreliable. Butler's response to both questions was effectively "no." He tested the spreadsheet to verify the accuracy of Sherry Barnett's work, and the error rate was "not significant enough" for Butler to lose confidence in his results.

Although the defendants claim to be challenging the reliability of Butler's testimony under FED. R. EVID. 702, their arguments implicate the weight of Butler's testimony and are not enough to show that the district court abused its discretion in admitting the testimony. Chuck and Bob Bates argue that Butler erred by testing a relatively small proportion of customer orders to estimate the total amount of customer losses, by focusing his assessment on customer records from 2007 through 2013, by conducting an analysis with an allegedly high error rate, and by using information from Barnett's spreadsheet in the course of his assessment of First American's unfulfilled customer

orders.   Although Chuck and Bob Bates provide reasons for doubting the persuasiveness of Butler's testimony, they do not succeed in showing that his testimony was unreliable under FED. R. EVID. 702.  Butler testified that his methods complied with professional accounting standards, that the error rate was not high enough to undermine his confidence in his estimate of First American's unfulfilled-order count, and that he took sufficient measures to verify the accuracy of the information in Barnett's spreadsheet.  His testimony was accordingly "reliable" under FED. R. EVID. 702, which provides that the reliability of proffered expert testimony must be assessed in light of "whether the testimony is based upon 'sufficient facts or data,' whether the testimony is the 'product of reliable principles and methods,' and whether the expert 'has applied the principles and methods reliably to the facts of the case.'"  *In re Scrap Metal Antitrust Litigation*, 527 F.3d 517, 529 (6th Cir. 2008) (quoting FED. R. EVID. 702).  When proffered expert opinions are "based upon facts in the record, and [are] not 'assumptions' or 'guesses,' challenges merely [go] to the accuracy of the conclusions, not to the reliability of the testimony."  *Id.* at 530 (citing *Jahn v. Equine Servs., PSC*, 233 F.3d 382, 390–93 (6th Cir. 2000)); *see also United States v. L.E. Cooke Co.*, 991 F.2d 336, 342 (6th Cir. 1993).  To the extent that Chuck and Bob Bates question the persuasiveness of Butler's conclusions, such challenges should be addressed through "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof," *Jahn*, 233 F.3d at 393 (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 596 (1993)), each of which was present in the defendants' joint trial.

We rejected a similar argument regarding the admission of expert testimony in *In re Scrap Metal Antitrust Litigation*, 527 F.3d 517 (6th Cir. 2008).  In that case the defendants claimed that the district court abused its discretion by admitting expert testimony where the putative expert "used erroneous data," altered some of the data, and "necessarily produced an erroneous

conclusion." *Id.* at 529. We determined that the defendants' criticisms challenged the persuasiveness of the putative expert's testimony, which was distinct from the testimony's reliability. *Id.* at 529–30. When evaluating an expert's reliability, "a court must be sure not 'to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other.'" *Id.* at 529 (quoting FED. R. EVID. 702 Advisory Committee's Note, 2000 Amend.). "Instead, the requirement that an expert's testimony be reliable means that it must be 'supported by appropriate validation—i.e., "good grounds," based on what is known.'" *Id.* (quoting *Daubert*, 509 U.S. at 590). Because the challenged expert "performed his analysis according to a reliable method . . . and reliably applied that method to the facts of t[he] case," we determined that the defendants' arguments implicated "the weight of the evidence, not [ ] its admissibility." *Id.* at 531. The same is true regarding Butler's testimony, and the district court did not abuse its discretion in admitting Butler's testimony under FED. R. EVID. 702.

### F. Alleged Violation of Kinsey Bates' Due Process Rights

Kinsey Bates challenges multiple objections and comments that the prosecution made during the trial, arguing that they violated her due process rights. For example, the prosecution objected to the way in which Kinsey Bates' attorney characterized the testimony of a Government witness. The prosecution also made multiple objections to allegedly improper questions that Kinsey Bates' attorney asked of witnesses, such as when Kinsey Bates' attorney questioned a Government witness about what he remembered from the testimony of a different witness.

The prosecutor's objections and comments did not violate Kinsey Bates' due process rights for two reasons. First, Kinsey Bates has not explained how the prosecutorial objections that she cites in her brief—two of which were sustained by the district court—were improper. Second, even if the objections were improper, they do not satisfy the standards for "flagrancy," which is

the second requirement that the defendant must show to prevail on a prosecutorial misconduct claim. *See United States v. Carson*, 560 F.3d 566, 574 (6th Cir. 2009). We assess whether a prosecutorial comment was "flagrant" based on the following factors:

> (1) [W]hether the conduct and remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the conduct or remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) whether the evidence against the defendant was strong.

*Id.* The second and fourth factors weigh against Kinsey Bates, given that she cites a relatively small number of instances in the course of a nineteen-day jury trial, and that the Government presented a significant amount of incriminating evidence against her. The third factor would likely weigh against the Government because the comments were deliberate. While the first factor arguably weighs against the Government as well, any prejudice to Kinsey Bates was minimal enough to satisfy the plain error standard of review that applies to this claim in light of Kinsey Bates' failure to object to the comments in the district court.

The district court's critical comments also did not violate Kinsey Bates' due process rights. In this context, we examine whether the district court's conduct fell "'demonstrably outside' the acceptable range of judicial behavior such that it amounted to 'hostility or bias' toward Defendant." *United States v. Powers*, 500 F.3d 500, 511 (6th Cir. 2007) (quoting *McMillan v. Castro*, 405 F.3d 405, 410 (6th Cir. 2005)). Kinsey Bates challenges multiple comments from the district court, including one instance in which the court admonished Kinsey Bates' attorney (outside the presence of the jury) to refrain from testifying during cross-examination, along with another in which the court cautioned the attorney to "stop editorializing" while questioning witnesses. Such comments fall within the bounds of appropriate judicial conduct. A district judge "may interject [her]self into the trial, speak to counsel, and question witnesses in order to clear up confusion regarding the evidence." *Id.* The judge also "has discretion to limit the scope of cross-

examination" by "impos[ing] limits based on concerns about harassment, prejudice, confusion of the issues, witness safety, or interrogation that is repetitive or only marginally relevant." *Boggs v. Collins*, 226 F.3d 728, 736 (6th Cir. 2000). These are precisely the steps that the district court took in this case. The judge also reprimanded the Government in similar ways, further undermining the theory that the district judge was biased against Kinsey Bates.

For these reasons, neither objections made by the prosecution nor critical comments by the district court to Kinsey Bates' lawyer during the trial violated her due process rights.

### G. Larry Bates' Sentence

The district court applied the following enhancements to Larry Bates' sentence: a six-point enhancement pursuant to U.S.S.G. § 2B1.1(b)(2) for "substantial financial hardship" affecting 25 or more victims; a two-point enhancement under U.S.S.G. § 3A1.1(b)(1), which applies when "the defendant knew or should have known that a victim of the offense was a vulnerable victim"; and a four-point enhancement for acting as an organizer or leader, based on the court's finding that the criminal organization was "otherwise extensive." The district court also determined that Larry Bates was responsible for a $21,637,145.06 loss to customers. In doing so, the court rejected Bates' argument that the amount of loss was based on unreliable information, such as Sherry Barnett's spreadsheet.

The district court's findings resulted in an advisory guidelines range for Larry Bates of 262 to 327 months of imprisonment. During the sentencing hearing, Larry Bates presented testimony from a geriatrics specialist who diagnosed Bates with "mild to early moderate" cognitive loss and predicted that Bates' health could further decline in six to nine years. The district court nonetheless declined to grant a downward departure and sentenced Larry Bates to 262 months of

imprisonment. For the following reasons, his sentence was not procedurally or substantively unreasonable.

**1. Procedural Reasonableness of Larry Bates' Sentence**

The district court came to a reasonable amount-of-loss determination, and properly applied sentencing enhancements for substantial financial hardship and for serving as an organizer or leader of criminal activity.

The district court's amount-of-loss determination was a reasonable estimate of the loss attributable to Larry Bates, despite the fact that the court relied on Dietz's estimate of customer losses. The amount-of-loss total was based on the losses that Dietz independently verified through measures like customer surveys, and the total subtracted the value of the coins stolen by Barnett. Such a calculation satisfies the standard required for an amount-of-loss determination under U.S.S.G. § 2B1.1(b), which provides that a court "need only make a reasonable estimate of the loss" that is "entitled to appropriate deference" on appeal. U.S.S.G. § 2B1.1(b), cmt.3(C).

With respect to the sentencing enhancements for substantial financial hardship and for inflicting harm on a vulnerable victim, the district court could properly rely on Dietz's list of customers with unfulfilled orders to identify victims, despite the fact that Dietz had used Barnett's spreadsheet for the preparation of that list. Dietz took multiple measures to independently verify the information on Barnett's spreadsheet, thereby mitigating the concerns that Larry Bates raises with respect to the reliability of Dietz's list.[2] Furthermore, the district court did not exclusively rely on Dietz's review when the court identified the twenty-five victims of "substantial financial hardship" who justified the enhancement under U.S.S.G. § 2B1.1(b)(C). The district court read through victim impact statements, along with victim testimony from the trial and sentencing, to

---

[2] For these reasons, it was also proper for the district court to rely on Dietz's customer list in its restitution and forfeiture calculations.

assess each victim's financial circumstances and evaluate whether those circumstances qualified as "substantial financial hardship" under the Guidelines.

With respect to the enhancement for being an organizer or leader under U.S.S.G. § 3B1.1(a), the lack of five or more "participants" in Larry Bates' criminal activity does not make the enhancement inappropriate. U.S.S.G. § 3B1.1(a) provides for a four-level sentencing enhancement "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." A "participant" refers to "a person who is criminally responsible for the commission of the offense, but need not have been convicted." U.S.S.G. § 3B1.1, Application Note 1.

On the assumption that there were fewer than five "participants" in the Bates' conspiracy, the organizer-or-leader enhancement was nonetheless applicable to Larry Bates because the district court properly relied on the second basis for the application of the enhancement: namely, that the "criminal activity . . . was otherwise extensive." U.S.S.G. § 3B1.1(a). Larry Bates' fraud scheme involved a sufficient number of people to satisfy that standard. Larry Bates managed a company with ten economists and multiple assistants who facilitated the fraud by encouraging prospective customers to buy coins when prior orders remained unfulfilled, and by attempting to mitigate customer concerns with misleading statements about First American's ability to meet its delivery requirements. The fraud scheme accordingly qualified as "otherwise extensive" criminal activity, which applies when the criminal activity in question amounts to the "functional equivalent of a crime involving five or more participants." *United States v. Anthony*, 280 F.3d 694, 699 (6th Cir. 2002). The most important indicator of such a functional equivalency is "numerosity." *Id.* at 700. "[A]ll persons involved during the course of the entire offense are to be considered," and "a fraud

that involved only three participants but used the services of many outsiders could be considered extensive." U.S.S.G. § 3B1.1, Application Note 3.

The district court properly determined that there were a sufficiently high number of participants in Larry Bates' fraud scheme for the criminal activity to qualify as "otherwise extensive." The district court's application of the sentencing enhancement is also consistent with a prior case in which we affirmed that the "otherwise extensive" language applied to a scheme that "involved the unknowing services of many outsiders." *United States v. Olive*, 804 F.3d 747, 759 (6th Cir. 2015). Any arguments to the contrary would not be enough to overcome the applicable standard of review, given that we "accord deference to the legal conclusion that a person is an organizer or leader under Section 3B1.1." *Id.* (citing *United States v. Washington*, 715 F.3d 975, 982–83 (6th Cir. 2013)).

For these reasons, Larry Bates' sentence was not procedurally unreasonable.

### 2. Substantive Reasonableness of Larry Bates' Sentence

As to substantive unreasonableness, the district court's rejection of Larry Bates' request for a downward departure based on his age and poor health was not substantively unreasonable. The district court denied the downward departure in part based on its own observations of Bates' ability "to fully conduct himself," concluding that his medical problems were not severe enough to warrant a sentence below the applicable Guidelines range. Because the federal prison system was equipped with "various kinds of facilities that can handle medical issues," the court determined that Larry Bates would be adequately cared for while serving his sentence. That determination was reasonable. The defendant "bears a heavy burden in showing that his sentence . . . is unreasonable," particularly when he is sentenced to the bottom of the applicable guidelines range, *see United States v. Cunningham*, 669 F.3d 723, 733 (6th Cir. 2012), and Larry Bates does

not carry that burden. Although district courts may rely on age and poor health "to support a below-guidelines sentence" in "exceptional cases," "the elderly do not have a license to commit crime, and adequate medical care is available in federal prisons." *United States v. Bistline*, 720 F.3d 631, 634 (6th Cir. 2013) (quoting *United States v. Moreland*, 703 F.3d 976, 991 (7th Cir. 2012)). The district court's reasoning was consistent with these points, and the court did not abuse its discretion in declining to lower Bates' sentence based on his age or testimony concerning his present and future medical problems.

## H. Procedural Reasonableness of Chuck Bates' Sentence

The district court also did not abuse its discretion in applying an enhancement to Chuck Bates' sentence based on its finding of substantial financial hardship to thirty-two victims. The sentencing enhancement was applied only after the district court assessed the relative financial harm suffered by each of the identified victims. Under U.S.S.G. § 2B1.1(b)(2)(C), the district court may apply a sentencing enhancement when the offense "resulted in substantial financial hardship to 25 or more victims." "Substantial financial hardship" should be evaluated by considering factors such as whether the victim became insolvent, filed for bankruptcy, or "suffer[ed] substantial loss of a retirement, education, or other savings or investment fund." U.S.S.G. § 2B1.1, Application Note 4(F)(i), (ii), and (iii). The district court did just that. It identified victims by examining their trial testimony, their sentencing hearing testimony, or their victim impact statements to assess "the impact of the loss" on each individual victim.

Each of the identified victims provided sufficient information for the district court to determine that he or she suffered substantial financial harm under U.S.S.G. § 2B1.1(b)(2)(C). Many impact statements contained detailed explanations of how the fraud negatively affected the victims' finances, such as by cutting into their savings, requiring them to postpone retirement to

mitigate their financial losses, or preventing them from adequately providing for their family members. Even the shortest impact statements included enough information to support the district court's finding that the victims experienced substantial financial harm. For example, Sydney Balovich reported a loss of approximately $368,000 and wrote that the money had come from her savings, her husband's life insurance policy, a family inheritance, and a "good chunk" of her retirement. Anne King reported "experience[ing] an appreciable loss of retirement funds . . . that [she was] not [ ] physically capable of replacing." Dan and Florence Benner described how they were a couple of extremely modest means "living on limited Social Security," making it reasonable for the district court to infer that their loss of $33,815 was substantial. Although Barbara Edwards was able to obtain a $50,000 home equity line of credit, she also explained that her "loss directly led to the exit of [her] retirement savings, then insolvency, then substantial harm to [her] ability to secure credit." Each of these comments implicates factors that support a finding of substantial financial hardship, such as whether the victim "suffer[ed] substantial loss of a retirement, education, or other savings or investment fund," whether the victim "ma[de] substantial changes to his or her living arrangements," and whether the victim "suffer[ed] substantial harm to his or her ability to obtain credit." U.S.S.G. § 2B1.1, Application Note 4(F)(iii), (iv), and (vi). Finding that the victims suffered substantial financial harm was accordingly within the district court's discretion.

The district court's findings satisfied the standards set by the two other circuits that have addressed the applicability of the substantial financial harm enhancement. *See generally United States v. Howder*, 748 F. App'x 637, 643–45 (6th Cir. 2018). In *United States v. Minhas*, 850 F.3d 873 (7th Cir. 2017), the Seventh Circuit upheld the application of § 2B1.1(b)(2) to a defendant who had used travel agencies to defraud customers and airlines of hundreds of thousands of dollars.

*Id.* at 875–76. To justify the enhancement, the district court "inferred" that all of the affected victims with respect to one part of the case were "of modest economic circumstances" based on testimony and victim impact statements from a subset of the victims. *Id.* at 876–77. The court then identified the victims of substantial financial hardship by "consult[ing] a chart that listed each victim's individual losses" and "reason[ing] that losses above a certain threshold to each one were substantial." *Id.* at 878. The Seventh Circuit determined that the district court's inference about the victims' financial circumstances was reasonable because it was based on information produced at trial and sentencing—including victim testimony about needing to save money to pay for the fraudulent trips. *Id.* at 878–79.

The district court in this case exceeded the *Minhas* standard because it identified thirty-two victims of substantial financial harm only after reviewing each individual's trial testimony, sentencing testimony, or victim impact statement, without relying on generalizations about the victims as a group. The district court's analysis was similar to the analysis that the Third Circuit affirmed in *United States v. Poulson*, 871 F.3d 261 (3d Cir. 2017). In *Poulson*, the district court applied the substantial financial harm enhancement after identifying twenty-five victims based on impact statements and declarations, in which the relevant victims reported filing for bankruptcy, losing a portion of their retirement funds, or making significant lifestyle changes to offset their financial losses. *Id.* at 266. The Third Circuit affirmed, determining that "drawing inferences based on a variety of facts is appropriate in construing 'substantial financial hardship.'" *Id.* at 269. The district court in *Poulson* relied on individual impact statements to identify victims of substantial financial harm, and its approach was virtually identical to that of the district court below. For these reasons, neither *Minhas* nor *Poulson* offers a reason to reject the district court's application of the sentencing enhancement for substantial financial harm to Chuck Bates.

This determination is not undermined by the district court's reliance on impact statements from victims who did not testify. The Guidelines permit the district court to "consider all information relevant to sentencing without regard to whether that information would be admissible at trial," and this provision extends to victim impact statements from victims who did not testify under oath at trial or sentencing. *United States v. Bolze*, 444 F. App'x 889, 891 (6th Cir. 2012) (citing U.S.S.G. § 6A1.3).

### I. Procedural Reasonableness of Bob Bates' Sentence

The district court properly applied an enhancement under U.S.S.G. § 2B1.1(B)(2)(B) to Bob Bates' sentence based on its finding of substantial financial hardship to five victims. The court applied the enhancement only after "review[ing] the evidence in the record" and identifying Robert Mathews, Stephen Gragg, Heidi Ottenstein, Shirley Vosse, and Gary Thornhill as victims of substantial financial hardship. All of these victims provided sufficient information in their victim impact statements for the district court to reasonably conclude that they had experienced "substantial financial harm" under U.S.S.G. § 2B1.1, Application Note 4(F). Mathews postponed his retirement and lacked enough money to care for his wife's early onset dementia. Gragg also lost a "large chunk" of his retirement, which forced him to move and "liv[e] alone in a small house with [his] son nearby too look in on [him]." Similarly, Ottenstein wrote that the Bates family "stole [her] entire life savings" and forced her to "be frugal and do without," while Vosse "had to live with family to survive" and "suffered harm with [her] ability to obtain credit" as a result of the fraud. Thornhill described his financial loss as a "[b]ig part of [his] <u>only</u> retirement," and wrote that he was "hopeless[ ]" about his "future plans considering retirement security." These statements implicate multiple factors weighing in favor of "substantial financial harm," including that the "offense resulted in the victim . . . suffering substantial loss of a retirement, education, or

other savings or investment fund." U.S.S.G. § 2B1.1, Application Note 4(F)(iii). The district court reasonably came to that same determination.

Gragg and Thornhill described their losses on a pre-printed form that contained a checklist asking whether they had experienced any of the factors weighing in favor of a finding of "substantial financial hardship" under U.S.S.G. § 2B1.1, Application Note 4(F).[3] Notwithstanding Bob Bates' arguments on appeal, the inclusion of the checklist did not unduly influence either of their impact statements. The pre-printed form prompted the victims to identify the "specific losses" that they suffered from the fraud, to indicate whether they had been "compensated by insurance or another source with respect to all of a portion of [their] losses," and to "[s]ummarize the overall impact" that the crime "had on [their] life/organization." All of these prompts were separated from the checklist on the pre-printed form, and the victim was not instructed to refer to any of the checklist's factors when responding to the other questions. The last prompt—asking for a description of the "overall impact" that the fraud had on each victim's life—is especially pertinent because both Gragg and Thornhill provided narrative responses to the prompt, and neither of their responses referred to the language in the checklist or otherwise indicated that the checklist influenced the answers. Further support for the credibility of the victim impact statements comes from Gragg and Thornhill's signatures on their respective forms, which are placed directly below a line indicating that a signature constitutes a declaration "under penalty of perjury [that] the foregoing is true and correct." There is no indication that the checklist improperly influenced the way in which Gragg or Thornhill filled out their victim impact statements, and the district court reasonably relied on those statements to identify Gragg and Thornhill as victims of substantial financial hardship.

---

[3] Matthews, Ottenstein, and Vosse did not use the pre-printed form, so none of their victim impact statements contained the checklist.

Although the district court did not estimate the net worth of any one of the victims, neither *Minhas* nor the Guidelines require that the court do so before making a finding of substantial financial hardship and applying the sentencing enhancement under U.S.S.G. § 2B1.1(B)(2)(B). The district court in *Minhas* did not estimate the net worth of the relevant victims, and the Seventh Circuit nonetheless affirmed the court's application of the enhancement for substantial financial hardship. *See* 850 F.3d at 875–76. That approach is consistent with the Guidelines, which make no mention of calculating net worth before assessing whether each victim's financial loss rose to the level of a substantial financial hardship. Instead, the Application Notes provide that the district court should consider multiple factors that would support a finding of substantial financial harm, including whether the victim lost a "substantial" portion of his or her retirement funds. U.S.S.G. § 2B1.1, Application Note 4(F)(iii). For these reasons, Bob Bates' sentence was procedurally reasonable.

## J. Procedural Reasonableness of Kinsey Bates' Sentence

The district court determined that Kinsey Bates joined the conspiracy to defraud in January of 2011, making her responsible for "all losses foreseeable to her as of the time she joined," regardless of whether she personally had contact with the customer in question. The court calculated that loss amount to be over nine million dollars. It later applied a sentencing enhancement based on the substantial financial hardship that Kinsey Bates caused to five or more victims. For the following reasons, Kinsey Bates' sentence was not procedurally unreasonable.

First, Kinsey Bates joins Larry Bates' challenges to the amount-of-loss calculation under U.S.S.G. § 2B1.1(b)(1)(K), to the applicability of the sentencing enhancement for "substantial financial hardship" under U.S.S.G. § 2B1.1(b)(2)(C), and to the applicability of the sentencing

enhancement for inflicting harm on a "vulnerable victim" under U.S.S.G. § 3A1.1(b)(1). These challenges do not succeed for the reasons given above in Part III.G.1.

Second, the district court did not erroneously conflate knowledge with jointly undertaken activity when it found that Kinsey Bates joined the conspiracy in January 2011. In support of its finding that, the court noted that by January 2011 Kinsey Bates "had been promoted to a position involving customer service for two months," "had been put on notice by her predecessor that 'there were problems with [First American],'" and had "received a substantial raise in salary and began dealing with customers 'more prevalently.'" "Intent can be inferred from[, among other things,] proof of knowledge," *United States v. Davis*, 490 F.3d 541, 549 (6th Cir. 2007), and the district court relied on Kinsey Bates' knowledge of problems within First American only insofar as it supported such an inference. Any remaining doubts about whether the district court's finding was correct are not enough to overcome the deferential standard of review, according to which "factual findings will stand unless clearly erroneous." *United States v. Rayyan*, 885 F.3d 436, 440 (6th Cir. 2018).

Third, the district court did not hold Kinsey Bates responsible for losses that occurred from purchases that were made before she joined the conspiracy in 2011. U.S.S.G. § 1B1.3, Application Note 3(b) states that "[a] defendant's relevant conduct does not include the conduct of members of a conspiracy prior to the defendant joining the conspiracy." The district court adhered to that requirement, as the court explicitly clarified during the sentencing hearing that "no one who purchased before she bought into the conspiracy is included in the actions that I'm holding her responsible for, the enhancements or the amount of loss." This is consistent with the district court's sentencing order, which determined that "Kinsey Bates could not have foreseen losses from sales

that occurred before she joined" and held her "culpable for all customers' losses occurring *after* she joined the conspiracy." (Emphasis added).

Fourth, to the extent that other First American "economists" facilitated the conspiracy by encouraging customers to purchase precious metals, their actions fall within the scope of "relevant conduct" and were properly considered by the district court. The district court was not required to limit the "relevant conduct" determination to actions by codefendants, as Kinsey Bates argues. U.S.S.G. § 1B1.3(a)(1)(B) provides that a co-conspirator's relevant conduct includes "all acts and omissions of others" that satisfy the following requirements: (1) they were "within the scope of jointly undertaken criminal activity"; (2) they were "in furtherance of that criminal activity"; and (3) they were "reasonably foreseeable in connection with that criminal activity." Nothing in this language limits relevant conduct to acts or omissions conducted by convicted co-conspirators.

For these reasons, Kinsey Bates' sentence was procedurally reasonable

### K. Joint and Several Liability for Forfeiture

The district court properly determined that Chuck and Bob Bates were joint and severally liable for the court-ordered forfeiture amount pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c). Section 2461(c) permits the Government to seek forfeiture against a defendant "charged in a criminal case with a violation of an Act of Congress for which the civil or criminal forfeiture of property is authorized." Section 981(a)(1)(C) is one such statute, and it authorizes the forfeiture of "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to a violation of" multiple statutes, including the statutes for mail and wire fraud.

The recent Supreme Court decision in *Honeycutt v. United States*, 137 S. Ct. 1626 (2017), does not preclude the application of joint and several liability under 18 U.S.C. § 981(a)(1)(C). In *Honeycutt*, the Supreme Court examined whether joint and several liability is permitted under 18

U.S.C. § 853(a)(1), a forfeiture statute that applies to "'property constituting, or derived from, any proceeds the person obtained, directly or indirectly, as the result of' the crime." *Honeycutt*, 137 S. Ct. at 1632 (quoting 18 U.S.C. § 853(a)(1)). The Court determined that "[f]orfeiture pursuant to § 853(a)(1) is limited to property the defendant himself actually acquired as the result of the crime," *id.* at 1635, emphasizing the importance of the statutory language specifying that forfeiture applies to "any proceeds *the person obtained* . . . as a result of" the crime. 18 U.S.C. § 853(a)(1) (emphasis added); *see also Honeycutt*, 137 S. Ct. at 1632. The dictionary definition and common usage of "obtain" indicate that the term corresponds to something that is acquired "by one's own effort," not to situations in which "an individual 'obtains' property that was acquired by someone else." *Honeycutt*, 137 S. Ct. at 1632. Joint and several liability would therefore be inconsistent with the plain meaning of § 853(a)(1), since it would hold defendants liable for the property obtained by the criminal acts of their codefendants. *Id.*

After the district court's forfeiture order was issued, we addressed whether *Honeycutt* applies to 18 U.S.C. § 981(a)(1)(C), the forfeiture statute at issue in this case, and determined that it does not. *United States v. Sexton*, 894 F.3d 787, 799 (6th Cir. 2018). We reasoned that "the phrase 'the person obtained'" was the "linchpin of the Supreme Court's decision in *Honeycutt*," making the case inapplicable to a forfeiture statute like § 981(a)(1)(C) containing no such phrase. *Id.* Section 981(a)(1)(C) provides that "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable" to one of multiple enumerated violations "is subject to forfeiture to the United States." This language merely requires that "the property [be] connected to the crime," and it accordingly permits a defendant to be held liable "for property that his codefendant acquired." *Sexton*, 894 F.3d at 799.

In light of *Sexton*, Chuck and Bob Bates were properly held to be joint and severally liable for forfeiture.

### L. Alleged Violation of the Eighth Amendment

Due to the applicability of joint and several liability, the district court found that each defendant was "liable for the proceeds paid to [First American] for unfulfilled orders during the time [he or she] was a member of the conspiracy." It ordered Chuck and Bob Bates to forfeit $19,571,532.09 as property derived from the proceeds of their crimes. On appeal, Chuck and Bob Bates summarily allege that the forfeiture amount violated the Eighth Amendment.

Assuming the Eighth Amendment's prohibition on "excessive fines" applies to the forfeiture in this case, *see* U.S. Const., Amdt. 8, no Eighth Amendment violation occurred. "[A] punitive forfeiture violates the Excessive Fines Clause if it is grossly disproportional to the gravity of a defendant's offense," *United States v. Bajakajian*, 524 U.S. 321, 334 (1998), and the forfeiture amount here falls short of that standard. When evaluating whether the a forfeiture amount was grossly disproportionate to the charged offense, the Supreme Court has considered the following factors: (1) "the amount of the forfeiture and its relationship to the authorized penalty"; (2) "the nature and extent of the criminal activity"; (3) "the relationship between the crime charged and other crimes"; and (4) "the harm caused by the charged crime." *Jalaram, Inc.*, 599 F.3d at 355–56 (citing *Bajakajian*, 524 U.S. at 337–39).

In this case, each of these factors weighs in favor of the Government. The forfeiture amount was calculated based on the losses suffered by First American customers from their unfulfilled orders and accordingly represents the harm that the defendants committed in the course of their conspiracy. The defendants, including Chuck and Bob Bates, were convicted of participating in a years-long conspiracy involving mail and wire fraud, and the conspiracy inflicted

a significant amount of financial and emotional harm on hundreds of customers. For these reasons, the forfeiture was not grossly disproportionate to the gravity of the charged offense, and the district court did not violate the Eighth Amendment by imposing it.

**III.**

The defendants' convictions and sentences are affirmed.